APPENDIX "A"

AT898 P.0206 P2

THE STATE OF TEXAS

VS.

GARCIA GLEN WHITE

IN THE __180__ DISTRICT

COURT OF HARRIS COUNTY, TEXAS

Change of Venue From: __N/A__

**JUDGMENT - DEATH PENALTY**

Judge Presiding: D. M. STRICKLIN     Date of Judgment: 7-23-1996

Attorney for State: L. MCLLELAND & J. WATERS

Attorney for Defendant: E. FREED & B. BENKEN

Offense Convicted of: CAPITAL MURDER

RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

Degree: CAPITAL    Punishment Assessed: DEATH    Date Offense Committed: 12-2-1989

Charging Instrument: Indictment        Plea: Not Guilty

Affirmative Findings: (Circle appropriate selection / N/A not available or not applicable)
DEADLY WEAPON: (Yes) No |N/A    FAMILY VIOLENCE: Yes |No (N/A)    HATE CRIME: Yes |No (N/A)

    The Defendant having been indicted in the above entitled and numbered cause for the felony offense indicated above and this cause being this day called for trial, the State appeared by her District Attorney as named above and the Defendant named above appeared in person with Counsel as named above, and both parties announced ready for trial.

    A Jury composed of MARCUS P. OCONOR and eleven others was selected, impanelled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea of not guilty thereto, after having heard the evidence submitted; and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and having heard argument of counsels, the Jury retired in charge of the proper officer and returned into open Court on __7-18__, 19_96_, the following verdict, which was received by the Court and is here entered on record upon the minutes:

"WE, THE JURY, FIND THE DEFENDANT, GARCIA GLEN WHITE, GUILTY OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT.

/S/ MARCUS P. OCONOR
FOREMAN OF THE JURY "

    Thereupon, the Jury, in accordance with law, heard further evidence in consideration of punishment, and having been again charged by the Court, the jury retired in charge of the proper officer in consideration of punishment and returned into open Court on the __23__ day of __JULY__, 19_96_, the following verdict, which was received by the Court and is here entered of record upon the minutes:
(Special Issues/Verdict/Certification):

Special Issue #1

Was the conduct of the defendant, Garcia Glen White, that caused the death of the deceased, Bernette Edwards, committed deliberately and with the reasonable expectation that the death of the deceased, Bernette Edwards, or another would result?

Answer

We, the Jury, unanimously find and determine beyond a reasonable expectation (that the death of the deceased, Bernette Edwards, or another would result) to this Special Issue is "Yes."

/S/ MARCUS P. OCONOR
FOREMAN OF THE JURY

CRM-95 R06-30-94

SPECIAL ISSUE NO. 2

(Special Issues - Continued): IS THERE A PROBABILITY THAT THE DEFENDANT, GARCIA GLEN WHITE, WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY?

ANSWER

WE, THE JURY, UNANIMOUSLY FIND AND DETERMINE BEYOND A REASONABLE DOUBT THAT THE ANSWER TO THIS SPECIAL ISSUE IS "YES". /S/ MARCUS P OCONOR
FOREMAN OF THE JURY

SPECIAL ISSUE NO. 3

DO YOU FIND FROM THE EVIDENCE, TAKING INTO CONSIDERATION ALL OF THE EVIDENCE, INCLUDING THE CIRCUMSTANCES OF THE OFFENSE, THE DEFENDANT'S CHARACTER AND BACKGROUND, AND THE PERSONAL MORAL CULPABILITY OF THE DEFENDANT, THAT THERE IS A SUFFICIENT MITIGATING CIRCUMSTANCES OR CIRCUMSTANCES TO WARRANT THAT A SENTENCE OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE IMPOSED? YOU ARE INSTRUCTED THAT IN ANSWERING THIS SPECIAL ISSUE" THAT YOU SHALL ANSWER THE ISSUE "YES" OR "NO". YOU MAY NOT ANSWER THIS ISSUE "NO" UNLESS YOU UNANIMOUSLY AGREE TO DO SO, AND YOU MAY NOT ANSWER THIS ISSUE "YES" UNLESS TEN (10) OR MORE OF YOU AGREE TO DO SO. YOU SHALL CONSIDER MITIGATING EVIDENCE TO BE EVIDENCE THAT A JUROR MIGHT REGARD AS REDUCING THE DEFENDANT'S MORAL BLAMEWORTHINESS.
ANSWER

WE THE JURY, UNANIMOUSLY FIND AND DETERMINE THAT THE ANSWER TO THIS SPECIAL ISSUE IS "NO." MARCUS P OCONOR
FOREMAN OF THE JURY

It is therefore considered, ordered, and adjudged by the Court that the Defendant is guilty of the offense indicated above, a felony, as found by the verdict of the jury, and that the said Defendant committed the said offense on the date indicated above, and that he be punished as has been determined by the Jury, by death, and that Defendant be remanded to jail to await further orders of this court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence against him as follows, to wit, "It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense indicated above and whose punishment has been assessed by the verdict of the jury and the judgment of the Court at Death, shall be delivered by the Sheriff of Harris County, Texas immediately to the Director of the Institutional Division, Texas Department of Criminal Justice or any other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas.

The said Defendant is remanded to jail until said Sheriff can obey the directions of this sentence. From which sentence an appeal is taken as a matter of law to the Court of Criminal Appeals of the State of Texas.

Signed and entered on this the 23rd day of July , 19 96 .

JUDGE 180TH DISTRICT COURT
Harris County, Texas

On this the 7th day of August 1998 Mandate of Affirmance received from the Court of Criminal Appeals.

04/999/8
LCBT
18/999/8

CRM-95  06-30-94

Unofficial Copy from Maurice's District Clerk

APPENDIX "B"

CAUSE NO. 0723847

| STATE OF TEXAS | § | 180th DISTRICT COURT |
|---|---|---|
| V. | § | OF |
| GARCIA GLEN WHITE | § | HARRIS COUNTY, TEXAS |

## EXECUTION ORDER

This Court, having received the mandate from the Court of Criminal Appeals affirming the Defendant's conviction in the above-styled and numbered cause, and having received notice that the Court of Criminal Appeals has denied habeas relief in the defendant's initial application for writ of habeas corpus, cause no. 0723847-A, now enters the following Order:

IT IS HEREBY **ORDERED** that the Defendant, GARCIA GLEN WHITE, who has been adjudged to be guilty of Capital Murder as charged in the indictment and whose punishment has been assessed at Death by the verdict of the jury and judgment of the Court, shall be kept in custody by the Director of the Texas Department of Criminal Justice – Correctional Institutions Division at Huntsville, Texas until **Tuesday, the 1st day of October, 2024**, upon which day, at the Texas Department of Criminal Justice – Correctional Institutions Division at Huntsville, Texas, at some time after the hour of 6:00 p.m., in a room designated by the Texas Department of Criminal Justice and arranged for the purpose of execution, the said Director, acting by and through the executioner designated by said Director as provided by law, is hereby commanded, ordered and directed to carry out this sentence of death by intravenous injection of a substance or

1

substances in a lethal quantity sufficient to cause the death of the said GARCIA GLEN WHITE, and until the said GARCIA GLEN WHITE is dead, such execution procedure to be determined and supervised by the said Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.

IT IS HEREBY **ORDERED** that the Clerk of the Court shall today send a paper and electronic copy of the Execution Order and Death Warrant in cause no. 0723847 to the following: Mr. Pat McCann, 700 Louisiana Street, Suite 3950, Houston, Texas 77002, writlawyer@outlook.com; Ms. Julia Bella, 200 S. 10th Street, Richmond, Texas 77469, julia@jbellalaw.com; Mr. Joshua Reiss, Harris County District Attorney, 1201 Franklin Street, Suite 600, Houston, Texas 77002, reiss_josh@dao.hctx.net; Mr. Benjamin Wolff, Office of Capital and Forensic Writs, 1700 N. Congress Ave., Suite 460, Austin, Texas 78701, benjamin.wolff@ocfw.texas.gov; Mr. Jay Clendenin, Office of the Attorney General of Texas, P.O. Box 12548, Austin, Texas 78711, Jay.Clendenin@oag.texas.gov; and Ms. Sian Schilhab, Court of Criminal Appeals, P.O. Box 12308, Austin, Texas 78711, Sian.Schilhab@txcourts.gov.

IT IS FURTHER **ORDERED** that the Clerk of this Court shall issue and deliver to the Sheriff of Harris County, Texas, a Death Warrant in accordance with this Order, directed to the Director of the Texas Department of Criminal Justice – Correctional Institutions Division at Huntsville, Texas, commanding him, the said Director, to put into execution the Judgment of Death against the said GARCIA GLEN WHITE.

IT IS FURTHER **ORDERED** that the Sheriff of Harris County, upon receipt of said Death Warrant, is to deliver said Death Warrant to the Director of the Texas Department of Criminal Justice – Correctional Institutions Division at Huntsville, Texas and shall take receipt of said Death Warrant and return the receipt to the Clerk of this Court.

SIGNED AND ENTERED this _____ day of _____, 2024.

Hon. DaSean Jones
Presiding Judge
180th District Court
Harris County, Texas

3

APPENDIX "C"

State of Texas
County of Travis

# AFFIDAVIT

**Affiant:**     Greg Hupp, Ph.D.
**Date:**      August 11, 2024


I, Greg Hupp, being duly sworn, depose and say:

## 1. Introduction and Credentials:

I am a licensed psychologist, specializing in neuropsychology. I have 25 years of experience working with individuals with varying levels of cognitive functioning, including those classified as low-functioning. My expertise includes administering and interpreting intelligence quotient (IQ) tests, formal assessments of adaptive functioning, academic achievement, and comprehensive formal battery neuropsychological tests. I have authored publications on cognitive assessment and intellectual development and traumatic brain injuries in children. I am a qualified mental health expert in the State District Court level in Texas and several other states, at the Federal District Court level, and at the Tribal District Court level. I have testified as a qualified expert witness on numerous occasions in these courts for both the defense and State. I most often serve in the capacity as a Court-appointed mental health expert in several jurisdictions in Texas, Arizona, Ohio, and Washington State for the purposes of advising the court on matters of competency to stand trial and the mental state of defendants at the time of the offense. I have been formally trained in the administration and advanced interpretation of intelligence tests and several formal neuropsychological testing batteries and am a qualified neuropsychologist with additional training in aviation-specific topics per the criteria set forth by the Federal Aviation Administration.

## 2. Purpose of Affidavit:

The purpose of this affidavit is to provide an informed opinion regarding the intellectual capacity of defendant Glen Garcia White, specifically as to how intelligence quotient (IQ) scores are overestimated in individuals with low cognitive functioning, including a discussion on the impact of the Flynn Effect on these assessments. This affidavit is based on my professional experience, relevant academic literature, and established principles in cognitive assessment.

## 3. Relevant Background:

Garcia Glen White was convicted in July 1996 for the December 1989 capital murder of two sixteen-year old sisters in Cause Number 723847 in the 180th Judicial District of Harris County, Texas. Mr. White was sentenced to death.

In his appeal, Mr. White requested relief of this sentence on the grounds that he has an IQ of 78 and that his trial counsel failed to discover or present this information to the jury. Such failure deprived Mr. White of the effective assistance of counsel and that new information regarding Mr. White's borderline intellectual disability may have provided essential information to the mitigation of this sentence.

More specifically, as a mental health expert specialized in the development, administration, and interpretation of intelligence tests, there are several areas of concern regarding that intelligence testing that would have significantly impacted Mr. White's score, and thus, his designation as an individual of low intellectual capacity. Such conditions may have resulted in a determination of an Intellectual Disability at the time of the actual testing in 2008, thus making Mr. White initially ineligible for the death penalty under the provisions of *Adkins v. Virginia*[1] and subsequently under the provisions of *Moore v. Texas*[2].

During his developmental period, there was evidence that Mr. White experienced significant adaptive deficits in his communication and verbal comprehension, demonstrated significant academic deficits and was only able to advance based on social promotion because of his football skills, which became evident during his one year of college on a football scholarship during which he failed every course in which he was enrolled. There was also evidence that Mr. White experienced repeated head trauma, with at one instance of extended loss of consciousness during a possible drowning episode, due, at least in part, to his many years of playing football, both formally and informally, in a position known to incur an excessive number of high-speed cranial impacts.

Evidence presented during testimony was that Mr. White was tested by clinical psychologist Patricia M. Averill, Ph.D. on July 24, 2008, when Mr. White was 45 years of age. Dr. Averill administered a standardized comprehensive intelligence test, the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), and a measure of academic achievement, the Wide Range Achievement Test, Revision (WRAT-R), the Mini Mental Status Exam, and a clinical interview. On the WAIS-III, Mr. White obtained a Full Scale Intelligence Quotient (FSIQ) standard score of 78, which placed him at the 7th percentile. It is standard practice, which was followed by Dr. Averill, to list a statistical range of scores based on standard errors of measurement given a 95% confidence interval of the test itself. An intelligence score is as estimation of the measure of true intellectual ability and not a determinate score due to inherent  internal consistency errors of a test of human abilities, which can fluctuate somewhat due to various environment and iatrogenic (aka individual) factors. In fact, Dr. Averill commented that Mr. White's "Full Scale IQ may not be the most accurate reflection of his current intellection [sic] functioning."

---

[1] Atkins v. Virginia, 536 U.S. 304 (2002).

[2] Moore v. Texas, 137 U.S. 1039 (2017).

Dr. Averill further wrote that "Mr. White is functioning within the Borderline range of intelligence. Based on his WRAT4 achievement scores and his reported poor grades in school it is doubtful that he has ever functioned at a higher level." It was further written that "Levels of intellectual functioning are on a continuum, with borderline intellectual functioning being just above mild mental retardation (now known as an Intellectual Disability)" and that individuals such as Mr. White "experience difficulties in many domains." As to those "many domains," one's performance collectively is known as "adaptive functioning" and are typically identified as to one's ability to function effectively and independently in social domains, with communication, maintenance of personal hygiene, adherence to basic rules of safety in the home and community, and occupationally such as performing tasks typical of independent daily living with limited or no support. Dr. Averill did not administer a formal measure of adaptive functioning as part of Mr. White's testing but commented that Mr. White "was not able to maintain housing for his family, nor was he able to manage his own finances" but was able to "compensate for other intellectual difficulties" through his interpersonal skills despite his "very low score on the Comprehension subtest, which assesses one's understanding of social mores."[3]

## 4. IQ Testing and Low Functioning Individuals:
IQ tests are designed to assess cognitive abilities across several domains, such as verbal comprehension, working memory, perceptual reasoning, and processing speed. However, when applied to individuals with low cognitive functioning, several factors can lead to an overestimation of their cognitive abilities.

### a. Test Structure and Norming Issues:
IQ tests are typically normed on a general population sample that includes individuals with a wide range of cognitive abilities. However, this norming process may not adequately represent individuals at the lower end of the cognitive spectrum. Consequently, the psychometric properties of these tests, including their reliability and validity, may be compromised when used with low-functioning populations. This can lead to an overestimation of IQ scores, as the tests may not accurately capture the cognitive limitations of these individuals.

### b. Floor Effects:
Many IQ tests have a minimum score, known as the "floor," which can present a significant limitation when assessing individuals with severe cognitive impairments. If an individual's true cognitive abilities fall below this floor, the test cannot accurately measure their functioning, often resulting in a score that overestimates their actual abilities.[4]

---

[3] Psychological Evaluation report. (12/30/2008). Patricia M. Averill, Ph.D., Clinical Psychologist. Houston, Texas.

[4] Whitaker, Simon. (2010). Error in the estimation of intellectual ability in the low range using the WISC-IV and WAIS-III. *Personality and Individual Differences*, 48(5), 517-521.

c. Adaptive Functioning Discrepancies:
   There is often a notable discrepancy between IQ scores and adaptive functioning in low-functioning individuals. For example, an individual might obtain a higher IQ score than expected but still struggle with basic life skills, such as communication, self-care, and social interaction. This discrepancy highlights the limitations of using IQ scores as the sole measure of cognitive ability in these populations. The provisions of *Moore v. Texas* stipulate that a standardized measure to assess one's adaptive functioning must be used in accordance with the evaluator's standards of practice in order to diagnose the presence of an intellectual disability as identified by *Atkins v. Virginia*. To my knowledge based on the court transcripts and subsequent appeals, Mr. White has never been administer nor evaluated on a standardized measure of adaptive functioning.

d. Test Anxiety and Performance Issues:
   Low-functioning individuals may experience significant anxiety during testing, leading to inconsistent or rushed responses. This can artificially inflate their IQ scores, as their performance under test conditions may not reflect their true cognitive capacity. Based on the available sources of information, Mr. White's emotional state was not assessed at the time of his intelligence testing.

## 4. The Flynn Effect and Its Implications:

The Flynn Effect refers to the observed phenomenon that IQ scores have been increasing over time, typically by about three points per decade. While this trend reflects changes in environmental factors, such as improved nutrition, education, and access to information, it also introduces complexities when interpreting IQ scores in low-functioning individuals.

The Flynn Effect means that older IQ tests may overestimate an individual's cognitive abilities when compared to more current norms. This is particularly relevant for low-functioning individuals, where even small increases in scores due to outdated norms can result in significant overestimations of their abilities, sometimes up to 20 points. Furthermore, the Flynn Effect primarily impacts the general population's scores, and its effect on those with low cognitive functioning is less well understood, potentially leading to misleading assessments.[5]

Mr. White was tested using the WAIS-III, which had been published in 1997. At the time he was tested, an updated edition of that intelligence test was being released on the market. The Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) was based on a modified theoretical construct of intelligence compared to the WAIS-III and earlier versions of the test. Research between the two editions suggests that "more weight" should be given to

---

[5] Kanaya, T., Scullin, M. H., & Ceci, S. J. (2003). The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnoses. *American Psychologist, 58*(10), 778–790.

the FSIQ obtained by the WAIS-IV that is "considered more valid, reliable, and consistent" with the test publisher's theoretical model.[6]

## 5. Conclusion:

Based on the factors discussed above, it is my professional opinion that IQ scores for low-functioning individuals, such as Mr. White, are often overestimated. The structural limitations of IQ tests, floor effects, discrepancies between IQ and adaptive functioning, and the influence of outdated norms due to both the Flynn Effect and an outdated edition of the intelligence test, all contribute to this overestimation. Therefore, the IQ score reported by Dr. Averill as part of Mr. White's *Atkins* evaluation was likely an over-estimation of his true intellectual abilities and lacked a formal assessment of Mr. White's adaptive functioning as is now required under the *Moore* decision required in the diagnosis of an Intellectual Disability.

I have examined the scores for Flynn effect and determined that the stated IQ score of 78 is overstated. Even contemporary commentary by the evaluating psychologist included concerns that this score was likely inflated and that Mr. White would likely never score higher. Conservatively, research indicates that a Flynn-adjusted score would be 75, and would more likely be much lower than that, placing Mr. White's IQ score within the range of an intellectual disability. Even a conservatively Flynn-adjusted score of 75 would be within the +/- 7 statistical band for the standard error of measurement on the WAIS-III; possibly placing his IQ score at 68.

The test itself appears to have given higher scores that were justified based upon the research, so I am leaning towards the side of a conservative view. Adaptive deficits in school, in his scores on the ACT, and failing grades were clearly present during his developmental period. The family history provided by the mitigation specialist, based on her long work with them through the COVID pandemic to the present to overcome their shame and fear to discuss Mr. White's problems in daily living and employment, showed significant adaptive difficulties early on despite the apparent social promotion due to Mr. White's football skills. Additionally, the multiple and frequent head trauma during his formative years was very likely harmful to his brain development.

Based on the contemporary concerns expressed by the evaluator during Mr. White's IQ testing regarding the over-estimation of the derived IQ score, evidence of adaptive deficits during his developmental period, and history of multiple head traumas during his developmental period, it is my professional opinion, to a high degree of psychological certainty, that Mr. White would meet the new criteria under the <u>Diagnostic and Statistical Manual – Fifth Edition, Text Revision</u> (<u>DSM-5-TR</u>) and the *Moore* cases for a diagnosis of an Intellectual Developmental Disorder (Intellectual Disability).

---

[6] Taub, Gordon and Benson, Nicholas. (2013). Matters of Consequence: An Empirical Investigation of the WAIS-III and WAIS-IV and Implications for Addressing the Atkins Intelligence Criterion. *Journal of Forensic Psychology Practice*, 13, 27-48.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


_Gregory Scott Hupp_

Greg Hupp, Ph.D.
Psychologist – Texas License No. 31593
5900 Balcones Dr., Ste. 13846
Austin, Texas 78731
Ph (512) 893-6337


Sworn to and subscribed before me this ___12th___ day of _____August_____, 20_24_.

_all R abdelkarim_

Notary Public
My Commission Expires: ___12/26/2025___

> **NOTARY PUBLIC**
> **STATE OF FLORIDA**
>
> ALI R ABDELKARIM
> Notary Public - State of Florida
> Commission # HH 210661
> Expires on December 26, 2025

Notarized remotely online using communication technology via Proof.
Florida  Broward County  Online Notary

APPENDIX "D"

Patricia M. Averill, Ph.D.
Clinical Psychologist
3818 Tartan Lane
Houston, TX 77025
(713) 741-3951

# Psychological Evaluation

| | |
|---|---|
| **Name:** | Garcia Glenn White |
| **Date of Birth:** | 02/04/1963 |
| **Date of Assessment:** | 07/24/2008 |
| **Date of Report:** | 12/30/2008 |
| **Examiner:** | Patricia M. Averill, Ph.D. |
| **Report Writer:** | Patricia M. Averill, Ph.D. |

**Purpose of Assessment:** Mr. White is a 45 year old African American male who is currently on death row. The purpose of this evaluation is to assess Mr. White's intellectual functioning.

**Examiner Information:** I have been licensed as a clinical psychologist in the State of Texas since 1994 and have been involved in clinical practice continually since that time. I obtained Master's and Doctoral degrees in Clinical Psychology from the University of Houston. I am involved in teaching and research, as well as direct and supervisory clinical work. Much of my direct clinical work has involved conducting psychological assessments, which have included intellectual, personality, and achievement components. The reasons for these evaluations have varied but have included support for a diagnosis of mental retardation, support for a dementia process, evidence of learning disabilities, support for or against termination of parental rights, and levels of care for children in Children's Protective Services. I have conducted four previous psychological evaluations on inmates for court-related information. I also have conducted many psychological evaluations on inmates who are currently in a psychiatric hospital.

## Assessment Instruments:

- Wechsler Adult Intelligence Scale – Third Edition (WAIS-III)
- Wide Range Achievement Test – Revision 4 (WRAT4)
- Mini Mental Status Exam
- Clinical Interview

## Materials Reviewed:

To prepare this report I have thoroughly reviewed the following records:
Documents regarding the legal definition of mental retardation
Journal articles on the effects of cocaine abuse

**Definition of Mental Retardation:** According to the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV), Mental Retardation is characterized by "significantly sub-average general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." In order to qualify as mental retardation, the onset of these symptoms must occur before age 18. The DSM-IV characterizes sub-average general intellectual functioning as an IQ of about 70 or below. However, the DSM-IV also explains that, due to a measurement error rate of approximately ± 5 points, IQ's between 65 and 75 can be considered sub-average, provided that there is also support for significant deficits in adaptive behavior. The definition of Mental Retardation under the Texas Health and Safety Code is very similar to that described in DSM-IV, in that it states " 'mental retardation' means significantly sub average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." [Texas Health and Safety Code, Section 591.003(13)]. Thus there is agreement between these two recognized guidelines on what is understood to be mental retardation.

**Relevant History:**

Mr. Garcia Glenn White is a 45-year-old male who reported that he has been on Death Row since September 13, 1996.

Mr. White said that he grew up in a healthy, single-parent family with 6 siblings (3 brothers and 3 sisters). He said that he was the third child. He said that he got along well with his siblings. He denied any awareness of problems during his delivery or any major illnesses during his childhood or during adulthood. He reported that he did incur a head injury at one time, having been hit with a baseball bat. However, he did not report any ongoing problems associated with the head injury.

**Review of School Performance:**

No school records were available. However, Mr. White said that he attended Scott Elementary School, Lamar Fleming Junior High School and Phylis Wheatly High school. He said that he attended regular classes and mostly made C's and D's, however, he said that he would not have passed his classes in high school if he had not been on the football team. He reported that he enjoyed history but did not do well in math, spelling, and science. Mr. White said that he had perfect attendance while in school and that he played football and track. He said that his sister helped him with his homework.

Mr. White attended Lubbock Christian College on a football scholarship. However, he hurt his knee and his girlfriend got pregnant, so he dropped out of college.

Note: all of the following information, regarding work, family, daily living, and substance abuse was gathered during a clinical interview with Mr. White.

**Work History:** Mr. White said that he worked at a company cleaning high-rise building windows from 1983 until 1988. He said that he stopped working for two years and resumed the same work with a different company from 1990 until 1993. Mr. White also said that he tried to sell drugs for a period of time, but then got hooked on them himself, so he stopped selling them. He also reported having worked at Whataburger for a short period of time and he worked for his father's auto mechanic shop.

**Family/Relationship History:** As mentioned earlier, Mr. White grew up in a single-parent family with six siblings. He said that his childhood was happy, and he had plenty of friends. He said that he has always been able to keep people laughing. He continued to have many friends during high school. He also had a girlfriend starting in 1980, who got pregnant while he was in college. His first son was born in 1982 and there are two additional children. He said that he and his girlfriend were together for thirteen years and they still keep in touch. Reportedly his son just graduated from high school and he is working on an offshore oil rig.

**Daily Living:** Mr. White said that he was able to maintain his own apartment with his girlfriend for a while when he was working. However, he lost the apartment due to inability to pay his bills, and his girlfriend got public housing. He said that he did not handle money very well and he gave his money to his girlfriend so she could handle it more appropriately. He said that he had a savings account for a little while but was unable to maintain it. He was able to make his own appointments and take care of his personal needs, both at home and within the community.

**Substance Use:** According to Mr. White, he started using marijuana in the early 1980's and then used used crack cocaine between 1984 and 1989. His employers sent him to Houston Recovery Campus in 1989, where he participated in a drug rehabilitation program. He said that it worked for 8-9 months, but then he started smoking crack cocaine again. He said that he broke up with his girlfriend in 1993, and this was associated with his drug use. He then started living with friends.

**Behavioral Observations:** Mr. White is a tall, very large and somewhat obese male, who was brought down for the initial assessment wearing prison scrubs. The prison guard informed Mr. White that the examiner had been sent by his lawyers to evaluate him. Mr. White said that his lawyer had already informed him that the examiner was coming and he said that he felt fine about participating in the assessment.

Mr. White arrived for the assessment wearing prison scrubs and his grooming and hygiene appeared to be excellent. At times, he was perspiring rather heavily and he wiped himself on a tissue paper. Mr. White was pleasant and cooperative throughout the

assessment period, and he put forth good effort on all the assigned tasks. He seemed motivated to do well and seemed somewhat concerned when he could not continue with a particular test. Based on his level of effort, it is believed that this is an accurate assessment of Mr. White's current level of functioning.

Mr. White was oriented to person, place and time. His speech was normal in tone and volume, but he tended to talk very quickly and at times he tended to mumble. He seemed to have adequate vocabulary skills. His mood appeared to be euthymic and his affect was congruent with his mood. He denied experiencing auditory, visual, or olfactory hallucinations, as well as mood swings. He said that he feels "OK" most of the time. However, he feels upset whenever one of the inmates is executed, because he has come to know the other inmates quite well.

**Intellectual Assessment:** On the WAIS-III, Mr. White obtained a Full Scale IQ of 78 (74-83 - 95% confidence interval, 7th percentile). There was a significant difference between his Verbal and Performance scores (75 and 86, respectively) suggesting that his Full Scale IQ may not be the most accurate reflection of his current intellection functioning. Mr. White's subtest scaled scores are listed below (Note: 10 is the average standard score for each subtest).

| Verbal | Scaled Score | Performance | Scaled Score |
|---|---|---|---|
| Vocabulary | 4 | Picture Completion | 12 |
| Similarities | 7 | Digit Symbol | 6 |
| Arithmetic | 8 | Block Design | 5 |
| Digit Span | 7 | Matrix Reasoning | 9 |
| Information | 7 | Picture Arrangement | 8 |
| Comprehension | 2 | | |

There is some variation in subtest scores within the verbal scales, with Comprehension being an area of significant weakness. This subtest measures ones understanding of social norms. Among the performance subtests, Mr. White obtained a score on Picture Completion that was a significant strength. This subtest measures one's ability to scan and pay attention to detail in familiar objects.

**Achievement Assessment:** On the WRAT4, Mr. White obtained a Word Reading standard score of 79 (6.5 grade, 8th percentile), a Sentence Comprehension score of 82 (9.2 grade, 12th percentile), a Spelling score of 84 (7.3 grade, 14th percentile), a Math Computation score of 76 (4.6 grade, 5th percentile) and a Reading Composite score of 78 (7th percentile). As can be seen, Mr. White's achievement scores are within the range expected based on his IQ but are well below expectations based on his reported completion of high school and one year of college. These scores are consistent with his reported difficulty achieving in school.

**Discussion:** As mentioned previously, Mr. Wright worked hard on all the assigned tasks. As such, this is believed to be an accurate reflection of his current intellectual functioning.

Based on the results listed above, it is apparent that Mr. White is functioning within the Borderline range of intelligence. Based on his WRAT4 achievement scores and his reported poor grades in school it is doubtful that he has ever functioned at a higher level.

Levels of intellectual functioning are on a continuum, with borderline intellectual functioning being just above mild mental retardation. Ninety-three percent of the population function at a higher level of intelligence than do those with borderline intellectual functioning. Thus, although, such individuals do not qualify for the MR diagnosis, they do experience difficulties in many domains, and in particular in academics. According to Mr. White, his grades were poor and would even been worse if not for his being on the football team and having his sister help him with his homework. Also, such individuals have difficulty remaining on task and often have behavioral problems, which may stem from frustration and emotional immaturity.

**Adaptive Functioning:**

Overall, it is difficult to ascertain how Mr. White functioned in many of the domains of adaptive functioning because we only have his self-report and no information from other sources. However, he was able to maintain employment for several years and he had a family. He was not able to maintain housing for his family, nor was he able to manage his own finances, but rather depended upon his girlfriend to take care of the bills. Based on this limited information, it is apparent that Mr. White had some deficiencies in maintaining himself financially. Reportedly, he always got along well with others and had not difficulties with social/interpersonal skills. It is likely that his interpersonal skills helped him to compensate for other intellectual difficulties.

**Summary:**
Overall, this assessment and Mr. White's records indicate that he is functioning in the borderline range of intelligence and it is highly unlikely that he functioned at a higher level in the past, based on his functional achievement. Mr. White's scores were somewhat inflated by his high score on the Picture Completion task, while most of his subtests scores are significantly below average. Mr. White's results indicate that he is one of those individuals who is ineligible for the MR label and associated protections but who, nonetheless, has intellectual limitations that are likely to result in social vulnerabilities. This vulnerability is supported by his very low score on the Comprehension subtest, which assesses one's understanding of social mores.

*Patricia M. Averill, Ph.D*

Patricia M. Averill, Ph.D.
Licensed Clinical Psychologist

arcia Glenn White
Psychological Evaluation
Page 6 of 6

## Addendum to psychological report dated 12/30/08

A review of the literature regarding cocaine abuse and its sequelae indicates that chronic
cocaine users demonstrate mild impairment on neuropsychological testing and they may
develop cerebral atrophy, primarily in the frontal and temporal areas of the brain (see
Warner, E.A., 1993). Based on the strong correlation between Mr. White's IQ and
achievement standard scores, it is very unlikely that his current low functioning can be
attributed entirely to his history of cocaine use. However, it is quite possible that his
cocaine use compromised an already compromised brain. The frontal area of the brain is
associated with the ability to plan, problem –solve, and inhibit inappropriate behaviors.

In addition to the above, cocaine use has been associated with violent behavior. Most of
the literature reveals that victims of homicide, particularly by firearms, and also suicide
victims, are significantly more likely to test positive for cocaine upon autopsy. Indeed, in
1989, 40% of all homicide victims in Fulton County, Georgia tested positive for cocaine.
Similar findings have been reported for Los Angeles County, California (Budd, R.D.,
1989). There is not a similar available literature regarding perpetrators of violent crimes,
not surprisingly, since the perpetrators are not often available for testing immediately
after the crime. However, it is likely that individuals who are high on cocaine are at
increased risk for behaving in a violent manner, since some of the symptoms associated
with cocaine use include increased alertness, high energy, talkativeness, and repetitive
behavior.

Patricia M. Avent, PhD

APPENDIX "E"

Affidavit of: Gina T Vitale, LMSW

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

1. My name is Gina T. Vitale. I am a master level social worker duly licensed to practice in the state of Texas since 1997. I am a member of the National Association of Social Workers, the National Association of Sentencing Advocates and Mitigation Specialists, and the National Association of Public Defenders.

2. I have been an independent contractor providing mitigation investigations and sentencing advocacy throughout the United States since 1999. I have experience working on capital and non-capital cases in both state and federal jurisdictions. I have served as a faculty member in numerous CLE-approved training seminars sponsored by the Texas Defender Service, Texas Criminal Defense Lawyers Association, the Montgomery County Bar Association, and the Texas State Bar Association. I am over 18 and am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

3. I was originally appointed to assist in the defense of Mr. Garcia Glen White on April 18, 2018. My work included reviewing trial transcripts and psychological reports, attempting to obtain historical records of Mr. White's childhood, and meeting with family members, friends, teachers, coaches and acquaintances.

4. Families are typically reluctant to reveal any history which may be painful or embarrassing during the initial phase of the investigation, and are careful not to say anything that they fear might reflect negatively on the defendant. Rapport building with the client and their family is critical to uncovering a thorough and accurate history. However, depending on the level of built-up defenses and mistrust for the system, this can be a lengthy process.

5. In person interviews are critical to relationship building with clients and their families. The inability to meet with family during the pandemic significantly hampered my ability to gain the trust of Mr. White's family.

6.      Early on in the investigative process, it became clear that Mr. White's family was protective of his image. Initial interviews yielded only the most positive information about Mr. White's character. While I believe that descriptions of his character were true, they did not paint the full picture of Mr. White's history, and reports of his academic successes were wholly inaccurate.

7.      During initial interviews, family members reported that Mr. White passed all of his classes and graduated at the top of his class. Report cards documenting his grades and class standing clearly indicate the opposite.

8.      Mr. White is one of seven children, two half-brothers, and more than ten cousins. Other than Mr. White, only one cousin attended college. Mr. White's college career, despite being short-lived and academically unsuccessful, understandably served as the foundation for the family's unwavering view of him as 'the smart one.'

9.      It was only through lengthy interviews with the family that their trust increased. However, their instinct to protect their loved one remained strong. It took an extensive knowledge of adaptive deficits and carefully crafted questions to uncover detailed descriptions of how Mr. White truthfully interacted with his environment, his family, and his community.

10.     Throughout his childhood and adolescence, Mr. White was surrounded by positive supports including consistent household rules, a large extended family and friend network, and attentive coaches. These supports allowed Glen to mask his deficits and function sufficiently within his community. Because Glen was able to get by without drawing negative attention, his deficits were never recognized as such by friends, teachers and coaches.

I swear the forgoing is true and correct.

_____                    Gina T Vitale, LMSW
Affiant (Signature)                                                 Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this $\underline{21}$ day

of _August_ 20 24

_[signature]_

NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

AARTI SIDDOTAM
My Notary ID # 132224074
Expires October 24, 2027

My commission expires

October 24th, 2027

# APPENDIX "F"

# GARCIA GLEN WHITE ADAPTIVE DEFICITS CHART

## CONCEPTUAL DOMAIN
### LANGUAGE; READING AND WRITING, MONEY, TIME AND NUMBER CONCEPTS

| Area of Adaptive Functioning | Data | Source |
|---|---|---|
| **Vocabulary:** Richness/consistency of expression Organized and coherent vs rambling and disjointed Expressive/Receptive Language | Chose video statement over written @ police dept (due to difficulty writing) Glen had a very difficult time spelling words correctly | Transcripts Interview w/Monica Garrett |
| Limited vocabulary and understanding of legal terminology | Glen White appears before the judge during a motions hearing. When asked about a letter he wrote, he states "yes, dismissed." His attorney and the Judge have to clarify that he means he wants to withdraw the letter | Hearing Transcript |
| Inability to express himself clearly. Rambling and disjointed speech | Q: Did you tell Sgt Rudolph or do you recall telling him specifically that you wanted a lawyer present? A: I don't remember telling him nothing Q: okay A: Realizing he wanted to talk to me I think that's the time I know of at the time I asked if I could lay on the floor. I was tired. I don't want to talk to you no more. | Hearing Transcript |
| Inability to express himself clearly Rambling and disjointed speech | Q: At any point during the conversation with them did you tell them that you had an attorney? A: I told them I had an attorney. I didn't want to say that | Hearing Transcript |

| | | |
|---|---|---|
| | Q: How did you tell them that? What did you say? A: I just told them when he came up and asked me how I was doing, then they did make another statement, they said, "We are going to go back into this room back here and talk." They said they was going…We are going to go back into this room here and talk, Okay?" and then when they said that, I said, "Well, I want to have my attorney here. I have a lawyer." | |
| **Time:** Analog and digital? AM/PM concepts Seasonal changes (daylight savings, holidays) Time zones | Glen never wore a watch He never had to tell time because he maintained the same schedule as a large group of friends. He left for school with them and came home with them | Family Interviews |
| **Numerical:** Basic mathematics Multi digit? Able to calculate sentence/probation/release | Glen depended on others for help with any mathematics Glen had difficulty adding anything more than single digit numbers | Family interviews |
| **Literature:** Reading materials Written communication Job announcement/application | Issues answering questions on rehab paperwork | HRC records |
| **Educational Achievement:** Diploma or GED SPED Vocational Training Dropout Behavior/absences Retention | Glen depended on his sister and friends to help with homework. Throughout Jr. High and HS she would write out answers and he would copy them into | Interview w/Monica Garrett |

| General knowledge | his own handwriting | |
|---|---|---|
| Learning difficulties | It was difficult for Glen to catch on to things. His grades remained poor despite help | Trial Transcript (Monica Garrett) |
| Learning difficulties | Glen would have been held back without help<br><br>Glen still passed even when his grades were bad<br><br>Glen needed 1:1 help to complete his homework<br><br>Monica would look at the work and break it down for him so that it was easier | Family Interviews |
| Poor reading comprehension | As recently as a few years ago, Glen would call his son and daughter in law for help with his Bible group homework.<br><br>Glen would read the questions to his daughter in law and she would explain what the question meant. Glen would tell her what he thought and she would help him come up with the words to express his thoughts | Family Interviews |
| Poor school performance | 1976-77: Glen attends 8th grade at Fleming Middle School<br>His grades are C's, D's and F's other than B in PE | School Transcript |
| Poor school performance | 1977-78: Glen attends "C9th" grade at Fleming Middle School<br>His grades are C's, D's F's except B in PE | School Transcript |

| | | |
|---|---|---|
| | F and B in Woodworking<br>Glen fails English and has to take summer school<br><br>Glen receives 'Good' and 'Excellent' marks in conduct and has limited absences | |
| Poor school performance | 1978-79: Glen attends 10th grade at Wheatley High School<br>His grades are C's, D's and F's except a B in one of three HPE semesters and one of two Reading Lab semesters<br>Glen receives a C in Developmental Reading<br><br>Conduct marks are 'Good', and he has only 6 absences | School Transcript |
| Poor school performance | 1979-80: Glen attends 11th grade at Wheatley High School<br>Glen receives A's in PE, an A & B in cooking, a C in AB Eng, a D in Eng, and a B & C in History<br><br>Attendance is only for recorded for four of the six sessions<br>Conduct is 'Excellent' and he has 10 absences | School Transcript |
| Poor school performance | 1980-81: GGW attends 12th grade at Wheatley High School<br>HIs grades are a B in cooking, F in Woodworking, and C's and D's in all other courses | School Transcript |
| Poor school performance | 3/12/81: Glen's class rank is 290 of 301<br>GPA 1.?535 | School Transcript |

| | | |
|---|---|---|
| Poor school performance | Glen "Did not do well academically" at college | Trial Transcript (Robert Yohman) |
| Poor school performance | Glen's "Achievement Scores in the low avg to mildly impaired range." | Trial Transcript (Robert Yohman) |
| Poor school performance | Glen "Achieved C's and D's got passed along within the system; probably never did achieve more than a reading, writing arithmetic level above low average to borderline, maybe even into the mildly impaired range." | Trial Transcript (Robert Yohman) |
| Poor school performance | Glen struggled to complete his homework. He just didn't get it | Family Interviews |
| **Executive Functioning:** Concrete approach to Problem Solving Abstract thinking Cognitive Flexibility Planning/Strategizing Priority Setting | Bender "Confirms that there is some sort of organic influence here in terms of neurological functioning. The errors have to do with planning and problem solving." | Trial Testimony (Dennis Nelson) |
| Cognitive deficits | Glen scored "particularly low in concentration, speed of thinking, attention span" | Trial Transcript (Robert Yohman) |
| Poor executive functioning | Glen scores were "fairly deficient on most tasks related to (executive functioning)" | Trial Transcript (Robert Yohman) |
| Cognitive deficits | Scores on cognitive tests showed "fairly low level defenses, and pretty much rigid." | Trial Transcript (Robert Yohman) |

| | Glen is confused by questions on cross and easily led by the prosecutor's questions. He frequently looks to lawyers for help | Hearing Transcript |
|---|---|---|
| **SOCIAL DOMAIN**<br>Interpersonal skills, social responsibility, self esteem, gullibility, naivete, follows rules/obeys laws, avoids victimization, and social problem solving | | |
| **Interpersonal Skills:**<br>Friends (ages)<br>Social isolation (bullying)<br>Fights/aggression<br>Dating<br>Fitting In<br>Social Cues<br>Emotion/Behavior Regulation | Glen possesses "Limited Social Skills" | (Trial Transcript<br>(Robert Yohman) |
| Inequality in dating relationships | DeShonda "ran him" | Family Interviews |
| **Self-Esteem:**<br>Fear of rejection by peers<br>Victimized | People sometimes teased him about his size<br><br>Glen cried easily<br><br>Glen got his feelings hurt easily | Family Interviews |
| **Rule Following:**<br>Games/leisure (age appropriate?)<br>Offense history<br>Comprehension/anticipation of consequences<br>Impulse control<br>Substance abuse (age) | Glen played games with family- Monopoly, Spades, etc- but he always lost. He would cry because he couldn't win. His family could not understand how he lost even at simple games like go fish and pitty pat. Even when he cheated he lost<br><br>Glen's substance. abuse got bad after his accident at work when he didn't have a football or work schedule to follow. | Family Interviews |

| | Glen would go and do the very thing you told him not to do | |
|---|---|---|
| **Social Responsibility:** Behavior (school and home) Social conventions/expectations Supports self (parents/spouse) | Glen''s favorite tv shows were Good Times, Jackson 5 and Tom and Jerry<br><br>Rather than coming home after school, Glen would stay and practice football. He would stay until someone kicked him out. | Family Interview |
| **Gullibility/Naivete/ Vulnerability:** Taken advantage of Poor Judgment Butt of Jokes Victimized by peers Easily cheated Follower Comprehends Risk | Glen repeatedly speaks with police seemingly unaware of potential risk to himself<br><br>On a school field trip to a. Battleship, everyone was pretending to jump off. Back at school, on a dare, Glen jumped off of the balcony into a courtyard below | Family Interviews<br><br>Transcripts of Police Interrogations |
| Naivete | Glen didn't have street smarts. He would go along with others | Family Interview |
| Poor comprehension of risk | Glen was shot after leaving the community center one night. Two groups had gotten into it and someone was badly beaten. When Glen decided to leave, his friends all said don't go because they didn't know what might kick off outside. Glen said he wasn't worried and left. He was shot by a group who came back to retaliate | Family/Friend Interviews |
| **Social Problem Solving:** Insight into motive/thinking of others Insight into own behaviors | Glen tells Officer Miller that he doesn't mind talking about the Williams case because he's "already been found | Statement to police |

| | | |
|---|---|---|
| Reciprocity<br>Avoiding problematic situations<br>Anticipating consequences | innocent on that case." | |
| Poor insight | Glen didn't think ahead. He would do something and think about it later | Family Interviews |
| Poor insight into motive of others | Glen doesn't believe that his friend would have ratted him out. The detectives have to play him the video | Statement to police |
| Poor insight | Glen would take whatever you said and not question it | Family Interviews |

## PRACTICAL DOMAIN
Activities of Daily Living, occupational skills, use of money, health care, travel/transportation, adherence to schedule/routines, use of communication (telephone, email)

| | | |
|---|---|---|
| **ADL's:**<br>Developmental milestones<br>Dressing self<br>Hygiene<br>Cooking<br>Cleaning<br>Home maintenance<br>Planning- daily activities<br>Childcare<br>Shopping | Glen was able to do chores (cook and clean), but he had to be taught how. His mom was very strict | Family Interviews |
| **Occupational Skills:**<br>Employment<br>Job applications<br>Equipment operations<br>Schedule/Routine- punctuality | Glen worked as cook and doing landscaping before his 1995 arrest<br>Glen worked with is father painting houses and at his mechanic's shop<br>Glen worked cleaning windows<br>Glen worked at KFC and Whataburger<br><br>Glen was badly injured in an accident at work. Glen was at the top of a forty foot ladder washing windows.  The | Trial Transcript<br><br>Family Interviews |

| | | |
|---|---|---|
| | ladder slipped and he fell to the ground. A Coworker was supposed to be at the bottom holding the ladder. It is unclear whether Glen told him to go do something else or if the man left on his own. | |
| **Safety and Health:** Medications MD appointments Medical history Substance Abuse Nutrition | Glen lit a firecracker in a vehicle gas tank. It exploded and burned his hand. Glen's brother yelled, "you so stupid, stupid, stupid." Glen did not apply for worker's compensation after his accident and did not attend follow up medical appointments as directed | Family Interviews |
| **Travel & Transportation:** Maps Public transport DL Vehicles Circumstances of long distance travel | Glen never owned a car. Coworkers drove him home from work Glen never got a driver's license Glen took the family car out without permission once. Glen ran the car into an apartment building because he "forgot to turn" | Family Interviews |
| **Money Concepts:** Values money Sums/balances/percentages Bank Accounts Budgeting | Glen never had an apartment of his own. He lived with various friends and family | Family Interviews |
| Limited ability to maintain finances and budgeting | When in a relationship, his girlfriend handled all the financial issues. Glen turned his paycheck over to her, and she managed the bills | Family/Friend Interviews |

|  | Glen was unable to maintain bank account | Family/Friend Interviews |
|---|---|---|
| **Communication:**<br>Telephone<br>Email<br>Keyboarding<br>Social Media | Glen never memorized phone numbers. If he needed to talk to someone he would go to their house. | Family/Friend Interviews |

APPENDIX "G"

Affidavit of: Monica Garrett

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Monica Garrett I am over the age of eighteen years old and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my older brother. I am eleven months younger than my brother. Even though I'm younger, I always helped Glen with his homework. Glen always struggled in school, and I helped him with his homework every day. Glen needed one on one help to understand and he got that from me at home. I made him do his homework, but I had to break it down so that stuff was easier to understand. He didn't understand certain things and it was hard for him to do the work. Math and spelling were particularly hard for Glen. Adding more than single digit numbers was difficult for Glen and he had trouble understanding and spelling compound words. Glen was a class clown. When he didn't know the answer, he would make jokes to take everyone's mind off what the teacher was asking. Glen cried when he didn't understand or when I'd make him repeat what I just showed him. The classes Glen did best in were woodworking, metal work and home economics. He liked things he could do with his hands.

Glen was quick to cry. If he told you something and you didn't believe him, he would cry, and he would cry whenever he lost at a game. We played lots of games at home, like Spades and Monopoly. Glen lost every single time. Glen even lost at simple games like go fish. Sometimes he would cheat, and he would still lose.

Glen always wanted to make people smile. He would do anything to get you to smile. He didn't ever get into fights or arguments. He was always giving.

Glen never had to worry about money for lunch at school. I had the money and if he needed anything, he would come to me.

Glen walked to and from school every day with a bunch of friends. He never walked home by himself. Even when it wasn't football season, if his friends played other sports, Glen would stay at school as late as he had to until he could walk home with his friends. The coaches knew him and would let him help out with small stuff while he waited.

At Fleming middle school, the buildings were set around courtyards. Each one was at least a story high with a floor of cement. One day, kids were daring Glen to jump, and he did. He jumped right over the railing into the courtyard. He sprained both of his feet.

Once Glen got injured and couldn't play football at Lubbock Christian College, he had to come home. Glen couldn't have made it without the support of coaches and other players.

I swear the forgoing is true and correct.

_Monica Garrett_
Affiant (Signature)

_Monica Garrett_
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 11th day
of _August_ 20 25

_Rudy C Vargas_
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

# APPENDIX "H"

Affidavit of: Lizzie White

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of
the following:

My name is Lizzie White, I am over the age of eighteen years old, and I am in all ways
qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my son. I have seven children and he is my third.

Glen always struggled in school and got bad grades, but with help from my daughter he did
better.

Glen had the same group of friends from elementary all the way up through high school. They
all went to the same schools and lived in the same neighborhood. They did everything
together and looked out for each other, so Glen couldn't have gotten into too much trouble.

One time, when I was visiting my family in Louisiana, Glen decided to take my car. Glen had
no idea how to drive. He went a couple blocks to pick up a friend and didn't even make it
three blocks before he ran the car into the side of an apartment complex. When I asked him
what happened, he said he forgot to turn. I can't imagine what made him think to take that car
knowing he couldn't drive. The police picked him up and I had to go and get him.

Another time we were visiting Louisiana, Glen set off a firecracker in a gas tank. The
explosion knocked him out and his cousins had to carry him back to the house. We had to
take him to the hospital to get looked at.

When Glen came back from Lubbock, he was working for Clean America. He had an accident
at work and fell when the ladder he was on slipped. He stayed at the hospital for a while. He
hurt his arm and his leg and he had to get stitches in his head because his head was caught
between the concrete and the ladder.

I swear the forgoing is true and correct.

_Lizzie m. White_
Affiant (Signature)

_Lizzie White_
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this _18th_ day
of _August_ 20_21_

_Rodolfo J. Vargas_
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

My commission expires

APPENDIX "I"

Affidavit of: Angela Drain *SWANSON  A.A.S*

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Angela Drain, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my older brother.

Glen always had a hard time with his school work, and my sister had to help him. He had trouble understanding the concepts and would cry easily when he got frustrated.

During summers, Glen and his friends played neighborhood football. They never had any pads or helmets, but played just as hard as they did during the school year.

Glen and his friends knew each other all of their lives. They had the same routine every day, so he didn't have to think too much about schedules. His life revolved around school and football.

When Glen was older, I got him a job working at Whataburger with me. He also worked at KFC.

Glen didn't ever memorize telephone numbers. All of his friends lived within a few blocks and if he wanted something he would just walk over and talk to them.

I swear the forgoing is true and correct.

_____
Affiant (Signature)

*Ancela SWANSON*
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this _18th_ day of _August_ 20_21_

_____
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

APPENDIX "J"

AFFIDAVIT

STATE OF TEXAS

COUNTY OF HARRIS

ON THIS DAY, THE AFFIANT BELOW DID APPEAR BEFORE ME TO
SWEAR AND SUBSCRIBE TO THE TRUTH OF THE FOLLOWING:

My name is Ray Manuel. I live in ~~Humble~~ *Spring (RM)* Texas. I am over eighteen and of sound
mind. I first met Glenn in Elementary School. Glenn was one year ahead. My
brother Tecumsah was in the same grade as Glenn and they both played defensive
end.

Glenn was the kindest person I knew. When Glenn lived with my family, Glenn
would walk my mother to the bus stop and then wait for her and walk her back
home. Glenn would also meet her after she'd been out drinking and walk her home
so that nobody messed with her. Glenn did more around the house than me and
Tecumsah did. Glenn cleaned all the time. When my mom was on her death bed,
she asked when she would see her son again. I thought she meant me at first, but
she said she wanted to see Glenn.

Glenn was a good worker. He always did labor type jobs. He worked as a
dishwasher at the Houston Club, worked for a car wash, and worked at Wendy's.
When we was done high school, we got work at Clean America where they did
window ~~washing.~~ *REPAIR (RM)*

Glenn got hurt on the job when no one was holding his ladder. Glenn was on a 40
ft. ladder and Mo Stevenson was supposed to be holding the bottom. I remembers
that Glenn's head hit the pavement and he had several stitches on the right side of
his head.

I do not recall if Glenn repeated any grades. We all had trouble picking up on
things and I was probably in some of those special classes too. Glenn struggled in
school and did not get good grades.

The Fleming and Wheatley coaches were really rough. Some coaches wouldn't
hesitate to hit the players if they didn't follow instructions immediately or

sufficiently. The coaches encouraged players to be as rough and tough as possible. With the coaches' support, the team slogan became "knock their dick in the dirt."

On what were considered light days, the players did not wear helmets, but they still played like it was a game. We got our bells rung near every darn day in those days. In addition to football at school, Glenn and me played in a neighborhood league. When playing neighborhood games, we wore no protective gear. Sometimes the neighborhood games were rougher than the school games because of neighborhood rivalries. It wasn't uncommon for someone's finger or shoulder to get knocked out of socket during a neighborhood game. You just popped it back in and kept on going. I recalls Glenn getting knocked out during one football game. They had to carry him to the side. Once they'd looked him over they put him back in the game.

Glenn never had his own apartment. He always lived with somebody who would cook for him and pay bills and such. He lived with my family, a girlfriend, then with me when I was living on his own.

I was around Glenn when he was using drugs, but when my daughter was born I had to make changes. I told Glenn I didn't want my daughter around any negative influences and told Glenn he would have to make a choice. He chose the drugs, and we parted ways.

I have visited Glenn and we started corresponding many years ago. He has returned to that sweet guy I knew before he was on drugs. I had a heart attack a few years back and I have been diagnosed with prostate cancer. I got no reason to lie.

I swear this is all true and correct.

Affiant: _____

Date: _____8/20/2024_____

Notary for Texas: _____

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

# APPENDIX "K"

Affidavit of: Alfred White Jr.

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Alfred White Jr., I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my younger brother. I am the oldest child and Glen is six years younger than me.

When we were in Louisiana visiting our grandmother, Glen and some of the cousins were out shooting off firecrackers. Glen was near an old gas tank and I told him not to pop the firecrackers near there. Glen lit it anyway and when it didn't go off at first, he got close to see what was wrong. That's when it went off and the flame shot out of the tank and knocked him back. Glen had trouble thinking ahead of what the consequences might be to his behavior. He wouldn't see the consequences until after.

Glen never had a car or driver's license and never had his own apartment or home.

Glen stayed with my wife and I for about six months. I have been down the same road as him, and I got him into recovery twice. He really wanted to change, but it's so hard once the drugs have a hold of you.

I have been in contact with Glen the whole time he's been locked up. We write to each other and he writes to my kids. He tries to use his situation to teach them. Glen is a source of comfort for all my family. He doesn't worry about his own situation; he just tries to make us feel good.

I swear the forgoing is true and correct.

_____
Affiant (Signature)


_____
Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 21st day of _____ 20 22

_____
NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

> RODOLFO J. VARGAS
> Notary Public, State of Texas
> Comm. Expires 12-31-2027
> Notary ID 10189841

APPENDIX "L"

Affidavit of: Howard Gordon

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Howard Gordon, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

I have known Garcia Glen White since we were six or seven years old. We went to the same school and were in the same grade from elementary through high school. He is my oldest friend. Glen stayed at my house all the time and we would sleep in the same bed. One of us with our feet one way and the other with his feet opposite.

Glen and I played football together at Fleming Middle School and Wheatley High School. They type of football we played was very competitive and very physical. Glen was a tough guy on the football field. Some people would shy away from contact, but not Glen. He was tough. We got hurt all the time playing football. Glen lost consciousness at least once on the football field, but the message we got was to suck it up and be a man. As we got older, I remember Glen complaining about headaches from all the hits he took in football.

In school, being there to play the game was the most important thing. If you got an F, you couldn't play the game on Friday. Coaches would do whatever they had to to make sure you would be eligible to play, and the teachers went along with it. Coaches would go to the players' teachers and ask what work needed to be done. The coaches would take all the work and then go find another student to complete it. Players were passed to the next class or the next grade all the time. It didn't matter what their grades were. That's just part of football. We gotta win not matter what. One time I got five F's and an F- on my report card and I still made the team and still went on to the next grade.

Glen really struggled in class. Everybody helped him with his homework. One of our friends used to do his homework for him and Glen would turn it in. It was all about being eligible to play.

Glen was a good enough player that the scouts who came to watch him play gave him a bus ticket and asked him to come play at Lubbock Christian College. I don't think he even lasted a whole semester. He came back home quick after he got hurt.

Glen was a big guy with dark skin and looked really intimidating, but he was the biggest whimp you'd ever find. Glen was easily influenced when we were growing up. If I said something was going to be that way, he would go along with it.

Glen would take any dare that someone gave him. Glen thought it was funny, but I remember telling him, that's not funny. You're going to hurt yourself.

Glen did all sorts of foolishness. As kids we used to go to the Fonde Rec Center to play basketball. They had a court where the professionals like Clyde Drexler all played and

another section for amateurs and the kids. We went one day and Glen just walked over to play with the pro's. We tried to tell him that wasn't allowed, but he went on over there anyway.

After Glen got hurt on the job, he didn't have any structure in his life. I could see him changing, and when I saw the guys he was hanging out with, I knew that no good would come of it. I talked to Glen about his addiction. I could tell he was embarrassed and ashamed, but he was like family to me and I wanted to help him. I told him that I would get him into the substance abuse program through my job by telling them we were half-brothers. Glen agreed, but it took a couple of days and when I went back to get him, he was with all of his so-called friends and they said he didn't want to talk to me. Glen was too easily influenced by them and didn't speak up for himself.

It's still hard for me to believe that Glen is in this situation. Until he got hooked on the drugs, there was nothing in him that would ever have done this. I still think about those days and talk about Glen all the time. My kids can't believe that they've never met someone who was such a big part of my life. I keep in contact with Glen even though it's hard for us. Talking about the old days is emotional, but Glen will always be family to me.

I swear the forgoing is true and correct.


*Howard Gordon*

Howard Gordon (Aug 22, 2024 20:16 CDT)

Affiant (Signature)                                    Affiant (Print Name)

SWORN AND SUBSCRIBED TO before me, the undersigned notary public on this 23rd day of August 2024

NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

PATRICIA ANN NOWAK
My Notary ID # 126607126
Expires March 29, 2026

# APPENDIX "M"

Affidavit of: Effron Williams

State of: Texas

County of: Harris

On this day, the Affiant below did appear before me and swear and subscribe to the truth of the following:

My name is Effron Williams, I am over the age of eighteen years old, and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge.

Garcia Glen White is my cousin. I am only three months older than Glen and we grew up together.

I played football, but was on the JV team while Glen was on the Varsity team. Glen was a star in football at our school. In addition to playing football in school, we played neighborhood football. When we played neighborhood football, we played without any pads or helmets. But we played just as hard as if we were, it was hard knocks.

I remember as Glen got older, he would complain about headaches. It might have been from football, but he got other knocks too. When we were about twelve, and swimming in the neighborhood pool, Glen did a flip into the pool trying to show off. He hit the back of his head on the side of the pool and sunk to the bottom. I'm pretty sure he lost consciousness because we rushed in to get him and pull him out. He lay on the side of the pool for a good while before he was able to get up. Another time, we were at our grandparents' in Louisiana. Our uncle worked on cars and there were parts all over the property. We were setting off fireworks in a field where there was a gas tank that had been pulled out of a car. Glen set a firecracker off right at the mouth of the gas tank. It went off like a bomb and blew him backwards. I was standing behind him but it blew him all the way back behind me. I took off running and screaming, but I'm pretty sure it knocked him out 'cause my other cousins had to carry him to the house.

When Glen was with Shonda, his kids' mother, she was in charge of his money. She took any money Glen made. Shonda and her mother even got Glen's tax refund one year. He never could figure out how to get it back.

Glen was always a follower instead of a leader. There was a guy in the neighborhood who was a year younger than Glen who got Glen to do all sorts of stuff for him. Other guys in the neighborhood knew to avoid him and not get involved, but he had Glen to do a lot of stuff he shouldn't have been doing.

I swear the forgoing is true and correct.

_____
Affiant (Signature)

_____
Affiant (Print Name)

of _Aug 23_ 20 _24_



NOTARY PUBLIC BY AND FOR
THE STATE OF TEXAS

My commission expires

RODOLFO J. VARGAS
Notary Public, State of Texas
Comm. Expires 12-31-2027
Notary ID 10189841

# APPENDIX "N"

BRIAN BENKEN
Lawyer
1545 Heights Blvd., Suite 900
Houston, Texas 77008
(office) 713-223-4051
(fax)    713-223-4052
Brian@Benkenlaw.com

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF HARRIS | § | |

## AFFIDAVIT OF BRIAN BENKEN

Before me, the undersigned authority, personally appeared Brian Benken, who, being by

me duly sworn, deposed as follows:


"My name is Brian Benken. I was the appointed trial attorney for Mr. White in his capital case
out of Harris County. We did not have sophisticated DNA testing at the time of Mr. White's
case. I had given a prior affidavit in this case for a prior petition. I stand by that affidavit but I do
not believe I fully addressed the issue of how I would have made use of the presence of a third
party male's DNA at the tragic death scene in this case to help my client avoid death.

First, I would have insisted that the sample, now still available, be run through the Combined
Offender DNA Information System [CODIS] for a potential match. Then I would have asked the
HPD investigator Todd Miller if he had run to ground the other suspects who undoubtedly visited
this apartment and crack den. Then I would have argued that the presence of another party made
it clear that we simply did not know what had happened, and likely never would. I would have
sought a plea to a lesser included offense at every opportunity to avoid the dangers of exactly
what happened...a huge black man portrayed as a raving monster to a mostly white jury. That is
exactly how the prosecutor portrayed him, and to find out years later that there was another party
or even a potentially exculpatory witness to rebut Officer Miller or put my client's actions in
perspective is frustrating.

Glenn has never gotten a fair shake on this matter. I believe that Miller tricked an apparently
simple man into not insisting on a lawyer being present, and I fully believe that the existence of
new evidence could have raised reasonable doubt about the death penalty. In our system, the jury
must have it proven to them that the person merits death versus life in prison. Glenn has been a
model prisoner and has proven he has never ever been a danger inside. He even saved an old
inmate's life named Gary Jackson up on the old row back in the 90's before they moved to

Polunsky. This man should not be executed now when there is so much we do not know.



BRIAN BENKEN

SWORN TO AND SUBSCRIBED before me on the 2l day of AUGUST ___, 2024.

_____

Notary Public in and for the State of
Texas

My commission expires:  03-20-2026

CHRISTIAN WENDENBURG
Notary Public, State of Texas
Comm. Expires 03-20-2026
Notary ID 12413352-5

# APPENDIX "O"



Monday, May 24, 2004

FORENSIC REPORT IDENTIGENE CASE NO

Referred by:

Houston Police Department
1200 Travis, 26th Floor
Houston, TX 77002
US

L89-13351

5615 Kirby
Suite 800
Houston, TX 77005

www.identigene.com

Reference

The following items were analyzed:

| Item Number | Description | Sample Type | Received From | Received On |
|---|---|---|---|---|
| 138414 | Exhibit 46 - beige sheet stain Z | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138415/138416 | Exhibit 46 - beige sheet stain E | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138417/138423 | Exhibit 46 - beige sheet stain G | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138418/138419 | Exhibit 46 - beige sheet stain P | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138420/138421 | Exhibit 46 - beige sheet stain V | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138422 | Exhibit 84 - beige sheet cutting | Evidence Sample | In person from J.L. Netherland | 1/16/2004 |
| 138424 | Reference bloodstain labeled "Bernette Edwards" | Reference Sample | In person from J.W. Belk | 12/5/2003 |
| 138425 | Reference bloodstain labeled "Annette Edwards" | Reference Sample | In person from J.W. Belk | 12/5/2003 |
| 138426 | Reference bloodstain labeled "Garcia White" | Reference Sample | In person from J.W. Belk | 12/5/2003 |

For the items listed above, DNA was extracted and amplified at thirteen polymorphic PCR loci (D3S1358, vWA, FGA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, TH01, TPOX, and CSF1PO) and Amelogenin. The DNA profiles of the evidence samples were compared to the DNA profiles of the reference samples.

**INTERPRETATION**

The reference bloodstain labeled "Bernette Edwards" [138424] produced a partial female DNA profile with alleles identified in only one locus. No conclusions will be made concerning the inclusion or exclusion of this sample to the evidence samples.

The reference bloodstain labeled "Annette Edwards" [138425] and the reference bloodstain labeled "Garcia White" [138426] each produced a full DNA profile.

The same full single-source female DNA profile was obtained from exhibit 46 - beige sheet stain Z [138414] and exhibit 84 - beige sheet cutting [138422]. This profile matches the DNA profile obtained from the reference bloodstain labeled "Annette Edwards" [138425] at all thirteen STR loci tested. Therefore, Annette Edwards cannot be excluded as the DNA donor to exhibit 46 - beige sheet stain Z [138414] or exhibit 84 - beige sheet cutting [138422]. The frequency of this profile from an unrelated individual chosen at random from the population at large is less than 1 in 2.7 x $10^{16}$ in African American, Caucasian, and Hispanic populations (FBI database). This profile does not match the DNA profile obtained from the reference bloodstain labeled "Garcia White" [138426]. Therefore, Garcia White is excluded as the DNA donor to exhibit 46 - beige sheet stain Z [138414] and exhibit 84 - beige sheet cutting [138422].

A male DNA profile, with four additional minor alleles whose source cannot be determined, was obtained from the epithelial cell fraction of exhibit 46 - beige sheet stain E [138415]. A male DNA profile, with three additional minor alleles whose source cannot be determined, was obtained from the sperm cell fraction of exhibit 46 - beige sheet stain P [138419]. The reference bloodstain labeled "Garcia White" [138426] is consistent with the major component of each of these two mixtures. Therefore, Garcia White cannot be excluded as the DNA donor to the major component of the mixture obtained from the epithelial cell fraction of exhibit 46 - beige sheet stain E [138415] or the major component of the mixture obtained from the sperm cell fraction of exhibit 46 - beige sheet stain P [138419]. The frequency of the major component of these two mixtures from an unrelated individual chosen at random from the population at large is less than 1 in 2.8 x $10^{17}$ in African American, Caucasian and Hispanic populations (FBI database). The major component of these two mixtures does not match the DNA profile obtained from the reference bloodstain labeled "Annette Edwards" [138425]. Therefore, Annette Edwards is excluded as the DNA donor to the major component of the mixture obtained from the epithelial cell fraction of exhibit 46 - beige sheet stain E [138415] and the major component of the mixture obtained from the sperm cell fraction of exhibit 46 - beige sheet stain P [138419].

IDENTIGENE is accredited by the National Forensic Science Technology Center (NFSTC).

1

# APPENDIX "P"

SETH W. SILVERMAN, MD, PA
3614 STONEHAM
HOUSTON, TEXAS 77047
(P) 713-528-1188  (F) 713-522-5764
Board Certification in Adult, Adolescent,
Addiction, and Forensic Psychiatry
E-mail silvermanpa@aol.com

1/11/02

The Honorable Debbie Strickland
180th District Court
The State of Texas
301 San Jacinto
Houston, TX 77002

## PURPOSE OF THE REPORT

This examiner was requested by defense counsel to submit a report to the court that would provide information that might assist in its determination as to whether Garcia Glen White's death penalty conviction should be reconsidered. This report includes new research findings on the short- and long-term effects of intoxicants on antisocial behavior. The report also addresses the defendant's deliberateness during his commission of the violent offenses, the contribution of the defendant's compromised intellectual functioning (organicity) towards the antisocial behavior, and the likelihood of the defendant's committing criminal acts of violence in prison or the community.

## FORENSIC CONCLUSIONS

After a review of available records, interviews, review of pertinent literature, and examination of the subject Mr. White, it is this examiner's conclusion that Mr. White:

1) Suffered from organic impairment that affected his judgement and made him more susceptible than normal to the effects of intoxicants.

2) Used cocaine over a period of time and at a rate that he would have suffered a loss of memory, decreased intellectual function, and significantly decreased his ability to engage in deliberate thought at the time of the offense for which he was convicted. These conclusions are based on a body of research that has been published since 1998 and not available since the time of his trial.

3) Based upon his life history, medical records, new research findings published since 1998 regarding the likely recidivism rate of capital and other offenders who are released into the community or monitored while incarcerated over long periods of time, and the removal of the affects of cocaine from his system, Mr. White's likelihood of committing criminal acts or violent acts is extremely low.

These summarized findings are explained in detail in the body of this report.

## SOURCES OF INFORMATION UTILIZED IN THE PREPARATION OF THIS REPORT

1. Forensic interview of Garcia Glen White (referred to hereafter as "Mr. White") in the Death Row attorney's booth at the Allan P. Polunsky unit of the Texas Department of Corrections (TDC) in Livingston, Texas on 1/3/0
2. "Confession tape" of Mr. White. The tape contains three interviews conducted by an HPD detective while alone with Mr. White in the interview room. Affidavit of a family member
3. Interviews of Mr. White, family members, and individuals familiar with Mr. White by Pat McCann and Rosa Eliades, appellate counsel for the defendant; Rudy Vargas, investigator; and Seth W. Silverman, M.D.
4. Materials supplied by defense counsel, including court transcripts, affidavits, charging and court documents, medical records, school records, jail records, probation records, and psychosocial histories

## INFORMATION NOT UTILIZED IN THE PREPARATION OF THIS REPORT THAT MIGHT BE HELPFUL

1. Additional records such as prison medical and disciplinary records (has required a court order)
2. Additional information such as medical, military, prison and work records (obtaining some of these records has required a court order)
3. Opportunity to interview staff and prison personnel to assess defendant's behavior while incarcerated (has required a court order)
4. Interviews with defendant in booth reserved for mental health evaluations on Death Row (has required a court order)
5. Opportunity to broaden literature research
6. Opportunity to interview defendant over longer period of time
7. Opportunity to interview previous defense counsel and District Attorneys (might require a court order)
8. Opportunity to interview detectives and other personnel who were involved in initial and subsequent investigations (has required a court order)

Please note that this examiner's obtaining the additional data might allow for a more verifiable violence risk assessment, assessment of Mr. White's pre-morbid (prior to using drugs and committing antisocial offenses) functioning, and assessment of his mental state at the time of the offenses (deliberateness).

## CHEMICAL DEPENDENCY HISTORY

Mr. White and records are consistent in their report of weekend use of marijuana dating back to 1981-82 and the progressive use of crack cocaine starting in 1985 until the time of incarceration in 1995. The defendant indicated that except for a seven-week period of

sobriety in 1993, which occurred while he was treated for his chemical dependency disorder, he almost always smoked cocaine daily and rarely went as long as three days without using. He commented that he supported his habit, which usually cost about $300/day, by working and stealing. Probation records indicate that he has tested positive for cocaine metabolites

Mr. White reported that he sought treatment on one occasion at the Houston Recovery Campus in 1993. He stated that he presented for treatment on his own accord because of his fears that his drug usage was dangerous to his coworkers. During his employ at Clean America, he had almost severed the finger or hand of a coworker while pressure washing after he smoked crack cocaine.

Harris County jail records indicate that Mr. White experienced psychotic symptoms attributed to the effects of illicit drugs. Symptoms consistent with chronic schizophrenia were noted in the jail records.

CRIMINAL HISTORY

Mr. White was charged with and convicted of killing a woman and her two daughters in November 1989. He reportedly killed these three women under circumstances similar to those of an alleged October 1989 murder. In October 1989, he was implicated in another killing, which allegedly resulted from a misunderstanding about how much money Mr. White owed for a sexual act that had transpired between them. Mr. White supplied drugs as part of his payment for sex in the alleged October 1989 offense and in the November 1989 offense. In 1995 he allegedly killed an individual during a convenience store robbery. Mr. White reportedly used the money obtained in the robbery to buy drugs. On all three occasions, he was under the influence of crack cocaine.

Counsel has informed this examiner that the most compelling evidence that links Mr. White to the1 October of 1989 murder was obtained during Mr. White's "confession." Mr. White reported that he "confessed" to that crime despite knowing that he was innocent. He "confessed" because he was allegedly given instructions by the interviewing officers that he would not be held accountable for the murder. Mr. White stated, " I was told … that it would go better for me if I helped them [the officers]." With some prodding and confronting by the officers, Mr. White identified someone else as the perpetrator of the offense.

Although the majority of the information related to the police during the "confession" was consistent with the physical and circumstantial information, Mr. White did not tell the truth when he reported that a co-conspirator was involved in the commission of the offense. Surprisingly, this examiner found all additional information furnished by the defendant to be consistent with other information reviewed for this report.

Probation records dated 4/25/98 note that Mr. White scored a 3 in Probation's prediction as to whether Mr. White would reoffend. The probation score results indicated that Mr.

3

White would be placed in a low risk category (minimum risk, 0-7; medium risk, 8-14; and maximum risk, 15+).

Counsel and Mr. White reported that he has maintained the highest level of behavioral responsibility and received no "write-ups" while incarcerated in the TDC. Please note that because this examiner did not have a court order, primary sources of information regarding Mr. White's behavior while incarcerated were not made available to this examiner. These sources include prison records and information obtained from interviews of prison personnel.

## JUVENILE HISTORY

Mr. White had one disciplinary offense while attending high school, reportedly because he did not "dress out" for an activity in the gymnasium He also once used his mother's car without permission.

## EDUCATION HISTORY

While completing high school, Mr. White worked and was a star football player. He obtained a grant or scholarship to Wheatley College in 1981. He did not return to college after his first year due to poor school performance. Of note, in high school Mr. White appeared to perform scholastically above his intellectual abilities, while his poor college performance was commiserate with his baseline, compromised intellectual functioning. He injured his knee during his first year at college and could no longer play football.

## MEDICAL HISTORY

Mr. White and records indicated that he has suffered many traumatic brain injuries and at least two episodes of unconsciousness lasting from ½ hour to two to three hours.

## PSYCHOLOGICAL TESTING

The results of tests administered by psychologists Robert Yoham and Denis Nelson in or about 1995 revealed that Mr. White to lack a personality disorder or psychotic illness and to have borderline to low average intellectual functioning, a history consistent with chemical dependency. A personality disorder can be defined as a long-term, maladaptive history of interpersonal relationships where the problems in the relationship are attributed by the patient to the other involved party. That is, the problems are always someone else's fault. Mr. White's test results are not consistent with those of an individual with an antisocial personality disorder, nor do the results demonstrate the presence of significant antisocial traits. Such results are almost unheard of in a criminal situation like the one discussed in this report and have never before been observed by this examiner. Differently stated, Mr. White's core personality is not antisocial. Only when he is under the influence of drugs does he exhibit antisocial behavior.

4

## VOCATIONAL HISTORY

Mr. White reportedly worked consistently while he attended high school. His longest period of employment occurred at Clean America. The owner of Clean America noted that Mr. White was an excellent worker and that despite Mr. White's current situation, the owner would be glad to rehire him. While he was working, Mr. White's left wrist was crushed. This severe injury resulted in residual pain and disability. He attributes part of his difficulty in finding consistent employment to this industrial accident.

In the years prior to his incarceration, Mr. White's work ethic deteriorated when he started using drugs daily.

Mr. White allegedly was rejected from the military. He attributes the rejection to poor performance on the recruitment screening.

## FAMILY HISTORY

Mr. White and his six siblings were raised in Houston by his mother. Except for a total of 3-4 years when she received subsistence, his mother allegedly supported the family. Mr. White met his father for the first time when he was age 18 and reported that he has enjoyed a close relationship with him since then. Records and Mr. White indicated that his father was gainfully self-employed as an automobile mechanic.

Substance abuse in the family, including his biological father, was reportedly limited to Mr. White's brother, who had been intermittently sober. Excluding the defendant, no family member has been allegedly involved with antisocial behavior, and all are gainfully employed. Mr. White described his mother endearingly and stated, "She taught us never to take anything off nobody (sic)."

Mr. White and counsel reported that his family members and friends write and visit him regularly and often. Mr. White and other sources of information revealed that he has supported his common law wife and his three children consistently since the time of their birth. This examiner was unable to reach his common law wife, DeShanta Flowers, to confirm or deny this information.

Mr. White and collateral information indicated that he has never been sexually or psychically abused.

## MENTAL STATE EXAMINATION DURING THE INTERVIEW OF 1/3/02

Mr. White was interviewed in the attorney's booth of Death Row. A thick, transparent window separated the defendant from this examiner. The interview took place by telephone.

The defendant's mental state was consistent with that of a non-psychotic individual with limited intellectual functioning. He appeared resigned, sad, and withdrawn. He answered

5

questions designed to elicit information about psychotic or paranoid symptoms. In his answers, he all but denied ever experiencing such symptoms. Mr. White stated he "didn't believe it ... wasn't there ... can't say."

Psychotic symptoms were recorded in Harris County Jail records.

CLINICAL ASSESSMENT

Mr. White has a strong history of a Chemical Dependency Disorder, probably congenital brain organicity as evidenced by his compromised intellectual functioning, and a history of significant head trauma. Tests and interviews indicate no antisocial personality disorder or traits when he is not intoxicated or subject to the longer term (months) influence of elicit drugs

Some data suggest that amphetamines produce long-term changes in brain function, which might result in the increased relapse rates in know abusers. Mr. White's extensive and chronic drug abuse, especially crack cocaine, might have been a result of such long-term changes. That is, some of Mr. White's later usage of illicit substances might have been caused by the side effects of earlier usage, even if he had been sober for weeks to months.

Although not specifically identified in the literature reviewed for this report, clearly identifiable stressors are present. A major example is the defendant' self-reported taking on at age eighteen of the primary support for his common law wife and his children. Other stressors are his documented disabling injury and compromised intellectual functioning. These two stressors have been observed by this examiner to predispose some individuals to drug abuse that is amenable to intervention.

REVIEW OF LITERATURE AS IT APPLIES TO MR. WHITE'S LIKLIHOOD OF COMMITING FURTURE VIOLENT ACTS

Precursors of future violent behavior have been demonstrated in the majority of individuals who have suffered from
 1. Severe physical or sexual abuse (not applicable to Mr. White)
 2. Individual impairment (applicable)
 3. Post Traumatic Stress Disorder (not applicable to Mr. White)
 4. Severe depression (not applicable to Mr. White)
 5. Traumatic Brain Injury (applicable)
 6. Community isolation and violence (applicable) Seth—where is community isolation indicated earlier in this report?
 7. Institutional faihure (not applicable)

If applied to Mr. White's behavior and history, symptoms 2, 5, and 6 would place him in a low risk category to commit future violent behaviors.

6

In the past five years, a great deal of research has addressed the prediction of violent offenses perpetrated by prior offenders. The research has resulted in the creation of tests that attempt to predict violence. These tests include, among others, the Violent Risk Assessment Guide (VRAG), the Sex Offender Risk Appraisal Guide (SORAG), the Courmier-Lang System for Quantifying Criminal History, and the Iterative Classification Tree (ICT). The most compelling data that validate these tests were not available at the time of trial and have been published since 1998.

In this examiner's opinion, most of these tests would predict that Mr. White would be at a low risk to reoffend.

## RECOMMENDATIONS AND SUPPLEMENTAL LITERATURE REVIEW

This examiner recommends that Mr. White be treated for chemical dependency and monitored for relapses as discussed below under *Treatment of addiction*. The probability of success is high because he lacks three negative characteristics: the predictors of institutional aggression, the early onset of juvenile delinquent behavior, and family deviance and disruption experienced before age 11. Factors that indicate the possible success of his rehabilitation include the late onset of drug usage, his forthrightness with this examiner, and his demonstrated work ethic and family support. Statistical studies support the unlikelihood of his committing future violent acts. All of these topics are discussed below.

### Treatment of addiction
The daily use of crack cocaine, as was Mr. White's self-admitted habit, is associated with the commission of more illicit activity, especially violence.

Conversely, if Mr. White maintained sobriety or even decreased his usage to less frequently than daily intoxication, his likelihood of committing future violent acts would decrease significantly.

A literature review revealed that indicate that the effect of intoxicants, specifically stimulants such as cocaine, can irreversibly compromise memory. The effects of these drugs have been demonstrated conclusively to contribute to the development of significant antisocial violent behavior. Individuals who use these drugs have been shown to suffer the disinhibiting or aggravating influences after maintaining sobriety for months.

On the other hand, recent research indicates that the diagnosis and treatment of cocaine addiction has become more accepted and successful. Within therapeutic communities, treatment has been shown to result in complete abstinence or significant reduction in the usage of intoxicants by two-thirds of patients. Successfully treated patients are arrested less frequently than their baseline, and are believed to commit significantly fewer antisocial acts when compared to their baseline rates. Boot camp has also been demonstrated to be an effective treatment modality.

Moreover, successfully treated, criminally convicted addicts have been shown to improve their psychosocial functioning and employment histories.

Please note that Mr. White has been treated only once for chemical dependency. His treatment met with limited success. Experience has demonstrated that the fewer treatments a chemically dependent individual has received, the more likely it is that the next treatment will work. Thus, if Mr. White were treated again, he might succeed at maintaining sobriety.

In addition, the likelihood of Mr. White's committing future violent acts could be decreased even further if

1. His behavior could be monitored and interventions made to prevent progression to violence. This modality is well documented in the literature regarding the treatment of chemical dependency and is termed "relapse prevention." In the majority of cases, the prodromal behavior that resulted in a violent act occurs over a period of weeks to months.
2. His behavior could be monitored through frequent urine samples. Should Mr. White relapse, the metabolites of cocaine would be readily detectable in his urine for days. Detection of the metabolites would allow for an early diagnosis of relapse. Early diagnosis would facilitate active intervention that might prevent further usage and the associated incidence of violent acts.
3. Utilizing the monitors named in numbers 1 and 2 should result in an even more significant decrease in the likelihood of Mr. White's committing future violent acts than if either monitor were utilized alone.

## Predictors of institutional aggression

Recent research indicates that anger, impulsivity, antisocial underpinnings, and personality style are strong predictors of institutional aggression. These factors outweigh ethnicity or previous violent behavior committed by the prisoner.

Weighed against these research findings, Mr. White's reported exemplary behavior while incarcerated and not intoxicated indicates that the likelihood of his committing future institutional violence is small.

## Early onset of juvenile delinquent behavior

The early onset of juvenile delinquent behavior is a strong, positive predictor of future criminal behavior. Mr. White's adolescent history, on the other hand, is characterized by two relatively minor events: not "dressing out" for gym and borrowing his mother's car without permission. By inference, Mr. White's lack of significant, early onset juvenile delinquent behavior would place him at low risk to commit future violent acts.

## Family deviance

Family deviance and disruption experienced before age 11 have been significantly associated with crime severity. Mr. White's family history of a consistent income, relatively stable home environment relatively free of drugs and alcohol, and no antisocial

8

behavior reported in family members decreases the likelihood of his committing future violent acts.

*Late onset of drug usage*

Late onset drug usage has been shown to more amenable to treatment than early onset usage. Mr. White's self-reported use of drugs starting after high school places him in a group of individuals who might be more successfully treated than those who start taking \drugs at younger ages.

*Forthrightness*

During the interview with this examiner, Mr. White demonstrated an unexpected level of honesty and reliability. This interviewer believes that Mr. White's forthrightness is an unusual and favorable indicator of his ability to be rehabilitated.

*Work ethic and family support*

Mr. White demonstrated a responsible work ethic in high school and afterward at Clean America until his wrist injury and drug use prevailed. He has also showed a strong commitment to supporting his common law wife and three children. His motivation is a mitigating risk factor. If rehabilitated, he might return to work.

In addition, his favorable family history and the ongoing support of his family are unusual in murderers and could contribute to his ability to be rehabilitated.

*Statistical studies of recidivism*

The studies illustrated in the appendix to this report clearly indicate that

1. Capitol murders that are released into the community are at a decreased likelihood to reoffend when compared to non-capitol murderers and individuals who are placed in the prison general population. See Figure 1.
2. Aging significantly decreases the likelihood that individuals will commit future antisocial acts either in the community or while imprisoned. This means that it less likely that Mr. White would reoffend if he were released today, six years after committing the alleged offense, and the risk would decrease even further if he were kept in prison longer and then released. See Figures 2, 3, and 4.
3. There are fewer serious, violent, prison rule violations among death row releasees than among other prisoners. See Figure 5.

The majority of the research reviewed for this report indicates that should Mr. White remain sober, the likelihood of his committing future violent acts would be greatly decreased when compared to his baseline. The baseline is other convicts convicted of capitol or less than capitol crimes.

9

## DELIBERATENESS

Mr. White's ability to deliberate or engage in deliberative thought at the time of this offense would have been seriously compromised due to the high likelihood of organic impairment and decreased thought function caused by his heavy cocaine use.

## FUTURE DANGEROUSNESS

The fact that he is older and the decreased likelihood that he would use drugs, if his behavior and urine were monitored, would in all medical probability, decrease the likelihood that he would commit a violent act.

In addition, without the use of intoxicants, the likelihood of Mr. White committing future violent acts would be decreased even further because he would not be subject to the long term effect of intoxicants as well as the short term effects.

## CONTRIBUTION OF ORGANICITY TOWARD MR. WHITE'S CRIMINAL BEHAVIOR

It is the clinical experience of this examiner, confirmed by some research findings not available until the past few years, that Mr. White's compromised intellectual functioning increases his risk of being effected by illicit substances. He would have been more likely to be effected than a person without such impairment. Whether the compromised functioning was present at birth or caused by traumatic brain injuries is irrelevant.

## FORENSIC CAVEATS AND CONCLUSIONS

Please note that violent behavior predictors are reliable for groups of individuals who share similar histories. The prediction of behavior for any one individual is either unreliable or fraught many false positives. Otherwise stated, the prediction of violent behavior for any individual is highly inaccurate if cognitive tests are the sole source of the prediction. The examination of Mr. White by this examiner relied, in part, on cognitive tests.

The likelihood that Mr. White will reoffend and commit a serious crime or violent act, is in all medical probability, significant less likely than the rate at which he committed violent acts prior to his incarceration. Moreover, the longer he remains in prison, the less likely it is that he will commit future violent acts and present an ongoing threat. He is also less likely than other released or incarcerated convicts to commit future violent acts.

These medically based opinions apply if the factors identified in this report are accurate, if this examiner's clinical experiences are applicable to Mr. White, and if the interventions suggested by this examiner are instituted.

Please note that due to constraints placed on this examiner by the court, the majority of information presented in this report concentrates on mitigating factors and excludes

10

aggravating factors. Should the court decide that a hearing or more information would be helpful in its determination of the likelihood that Mr. White will commit future dangerous acts and present an ongoing threat to society, a more complete review of the literature and additional clinical data will be supplied.

It is the hope of this examiner that the information contained in this report assists the court in its determination of Mr. White's future dangerous behavior, his ability to deliberate at the time of his offense, and the potential mitigation offered by the organic damage to his brain functions caused by prolonged cocaine use.

This examiner defers to the court for the ultimate answer to the likelihood of the defendant's committing criminal acts of violence that would constitute a continuing threat to society if he were released into the community, and to the determination of the legal consequences of these facts.

Please call 713-528-1188 with questions regarding this report.

Seth W. Silverman, M.D.

Unofficial Copy Office of Marilyn Burgess District Clerk

## APPENDIX

All illustrations are from "Integrating Base Rate Data in Violence Risk Assessments in Capital Sentencing" by Mark D. Cunningham, Ph.D., and Thomas J. Reidy, Ph.D. Their article was published in *Behavioral Sciences and the Law*, Vol. 16, pages 71-95, (1998). Permission to reproduce the illustrations has been requested.

The illustrations have been renumbered below to correspond to the order in which they are referred to in this examiner's report.

- Figure 1. Base rates of parole recidivism of capitol murderers, murderers, and general population inmates (Cunningham and Reidy, p.81)
- Figure 2. Community prevalence of violent behavior by age (Cunningham and Reidy, p. 85)
- Figure 3. Age distribution of criminal offenders in the general population of the United States 1977 (Cunningham and Reidy, p. 84)
- Figure 4. Incidence of prison infractions in NY, 1975, by age (Cunningham and Reidy, p. 86)
- Figure 5. Reported serious violent prison rule violations (Cunningham and Reidy, p. 78)

FURTHER, AFFIANT SAYETH NAUGHT.

_____
SETH W. SILVERMAN, M.D.

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 11ᵗʰ DAY OF JANUARY, 2002.

_____
NOTARY PUBLIC

X Personally known to me, or
___ Produced identification:

Nicole M Cotton
My Commission CC785365
Expires October 26, 2002

Type of Identification Produced:

_____N/A_____

Figure 1. Base rates of parole recidivism of capitol murderers, murderers, and general population inmates

Unofficial Copy Office of Marilyn Burgess District Clerk

Base rates of violence in capital sentencing

| Study | Sample | Follow-up Interval | N | Recidivism Rate | New Murder Rate |
|---|---|---|---|---|---|
| **Capitol Murderers** | | | | | |
| Marquart & Sorensen (1989) | National Sample | 1972–87 | 188 | .20-prison/.10-new felony | .005 |
| Bedau (1964) | NJ | 1907–60 | 31 | .03 new felony | 0 |
| Bedau (1965) | OR | 1903–64 | 15 | .20 return to prison | 0 |
| Vito & Wilson (1988) | KY | 1973–85 | 17 | .29 return to prison, 6 jailed | 0 |
| Wagner (1989) | TX | 1924–88 | 84 | .08 new felony | 0 |
| Stanton (1969) | NY | 1930–61 | 63 | .05 return to prisons | 0 |
| **Non-Capitol Murderers** | | | | | |
| Dunatly & Bala (1984) | NY | 1977, 5 yr post-release | 64 | .27 return to prison | — |
| Bedau (1982) | 12 States | 1900–76, 6–23 yr post-release | 2646 | .03 new felonies | .006 |
| Bedau (1982) | Nationwide | 1965–69, 74–75, 1st yr of release | 11,404 | .015 in/or violations | .003 |
| Bedau (1982) | Nationwide | males, 1st yr of release | 6004 | .01 new felony | .002 |
| Stanton (1969) | NY | 1945–61 | 786 | .004 new felony | .001 |
| Beck & Shipley (1989) | 11 States | 1983, 3 yr post-release | 514 | .22-prison/.03-new felony | .004 |
| | | | 506 | .21 return to prison | .07 |
| Eisenberg (1991) | TX | 1986, 5 yr post-release | 56 | .45 return to prison | reincarcerated |
| Perkins (1994) | 29 States | parole discharge 1992 | 5371 | .33 return to prison | — |
| Carmichal (1990) | NY | 1985–91, 3 yr post-release | 5054 | .24 return to prison | .024 |
| **General Prison Population** | | | | | |
| Beck & Shipley (1989) | 11 States | 1983, 3 yr post-release | 14,355 | 41.4 return to prison | .03 |
| Perkins (1994) | 29 States | parole discharge 1992 | 209,295 | .46 return to prison | reincarcerated |
| Eisenberg (1991) | TX | 1986, 5 yr post-release | 1539 | .48 return to prison | — |
| Cancreta (1990) | NY | 1985–91, 3 yr post-release | 121,555 | .44 return to prison | .004 |

Figure 2. Community prevalence of violent behavior by age



Figure 3. Age distribution of criminal offenders in the general population of the United States 1977



P.4

Figure 4. Incidence of prison infractions in New York, 1975, by age



Figure 5. Reported serious violent prison rule violations



SETH W. SILVERMAN, M.D., P.A.
BOARD·CERTIFIED IN FORENSIC, ADDICTION,
ADOLESCENT AND ADULT PSYCHIATRY

4/27/02

The Honorable John D. Rainey
515 Rusk
Houston, TX 77002

PURPOSE OF THE REPORT
This examiner was requested by defense counsel to submit a report to the court that
would provide information that might assist in its determination as to whether Garcia
Glen White's death penalty conviction should be reversed. This report includes new
research findings on the short- and long-term effects of intoxicants on antisocial
behavior. The report also addresses the defendant's deliberateness during his commission
of the violent offenses, the contribution of the defendant's compromised intellectual
functioning (organicity) towards the antisocial behavior, and the likelihood of the
defendant's committing criminal acts of violence in prison or the community.

FORENSIC CONCLUSIONS
After a review of available records, interviews, review of pertinent literature, and
examination of the subject Mr. White, it is this examiner's conclusion that Mr. White:
1) suffered from an organic impairment that affected his judgement and made him more
   susceptible than normal to the effects of intoxicants.
2) used cocaine over a period of time and at a rate that he would have suffered a loss of
   memory, decreased intellectual function, and significantly decreased his ability to
   engage in deliberate thought at the time of the offense for which he was convicted.
   These conclusions are based on a body of research that has been published since 1998
   and not available since the time of his trial.
3) based upon his life history, medical records, new research findings published since
   1998 regarding the likely recidivism rate of capital and other offenders who are
   released into the community or monitored while incarcerated over long periods of
   time, and the removal of the affects of cocaine from his system, Mr. White's
   likelihood of committing future criminal or violent acts is extremely low, particularly,
   if he were to remain drug free.

These summarized findings are explained in detail in the body of this report.

3614 STONEHAM STREET, HOUSTON, TEXAS 77047
TELEPHONE: 713.328.1188  FACSIMILE: 713.322.3784
EMAIL: SILVERMANPA@AOL.COM

SOURCES OF INFORMATION UTILIZED IN THE PREPARATION OF THIS
REPORT
1. Forensic interview of Garcia Glen White (referred to hereafter as "Mr. White") in
the Death Row attorney's booth at the Allan P. Polunsky unit of the Texas
Department of Corrections (TDC) in Livingston, Texas on 1/3/0
2. "Confession tape" of Mr. White. The tape contains three interviews of Mr. White
conducted by an HPD detective
3. Interviews of DeShanta Flowers (Mr. White's common law wife and mother of
his three children), Pat McCann and Rosa Eliades, appellate counsel for the
defendant and Rudy Vargas, investigator
4. Materials supplied by defense counsel, including court transcripts, affidavits,
charging and court documents, medical records, school records, jail records,
probation records, and psychosocial histories
5. Literature search pertaining to the short- and long-term effects of cocaine on
mental status and behavior, violence prediction in criminal offenders and
treatment of addiction in criminal offenders

INFORMATION NOT UTILIZED IN THE PREPARATION OF THIS REPORT THAT
MIGHT BE HELPFUL
1. Additional records such as prison medical and disciplinary records prior to his
incarceration on Death Row (has required a court order)
2. Additional information such as military records (when he allegedly rejected from
the military due to his low test grades), employment records and work records
(obtaining some of these records has required a court order)
3. Opportunity to interview staff and prison personnel to assess defendant's behavior
while incarcerated (has required a court order)
4. Interviews with defendant in booth reserved for mental health evaluations on
Death Row (has required a court order)
5. Opportunity to interview previous defense counsel and District Attorneys (might
require a court order)
6. Opportunity to interview detectives and other personnel who were involved in
initial and subsequent investigations (has required a court order)

Please note that obtaining the additional data might allow for a more accurate assessment
of Mr. White's pre-morbid functioning (prior to using drugs and prior to committing
antisocial offenses), assessment of his mental state at the time of the offenses
(deliberateness) and prediction of future violent behaviors.

CHEMICAL DEPENDENCY HISTORY
Mr. White and records are consistent in their report of his weekend use of marijuana
dating back to 1981-82 and his progressive use of crack cocaine starting in 1985 until the
time of his incarceration in 1995. The defendant indicated that except for a seven-week
period of sobriety in 1993, which occurred while he was treated for his chemical
dependency disorder, he almost always smoked cocaine daily and rarely went as long as
three days without using. He commented that he supported his habit, which usually cost

2

about $300/day, by working and stealing. Probation records indicate that he has tested positive for cocaine metabolites

Mr. White reported that he sought treatment on one occasion at the Houston Recovery Campus in 1993. He stated that he presented for treatment on his own accord because of his fears that his drug usage was dangerous to his coworkers. He reported that on one occasion, he used the pressure washer at work after he smoked cocaine and almost severed the finger or hand of a coworker. It was this incident, according to Mr. White, that prompted him to seek treatment.

Harris County jail records indicated that Mr. White experienced psychotic symptoms while intoxicated which were attributed to the effects of illicit drugs on his cognition. Symptoms consistent with chronic schizophrenia were also noted in the jail records.

CRIMINAL HISTORY
Mr. White was charged with and convicted of killing a woman and her two daughters in November 1989. He reportedly killed these three women under circumstances similar to those of an alleged October 1989 murder. In October 1989, he was implicated in another killing, which allegedly resulted from a misunderstanding about how much money Mr. White owed for a sexual act that had transpired between them. Mr. White supplied drugs as part of his payment for sex in the alleged October 1989 offense and in the November 1989 offense. In 1995, he allegedly killed an individual during a convenience store robbery. Mr. White reportedly used the money obtained in the robbery to buy drugs. On all three occasions, he was allegedly under the influence of crack cocaine.

Counsel informed this examiner that the most compelling evidence that linked Mr. White to the October 1989 murder was obtained during Mr. White's confession. Mr. White reported that he confessed to that crime despite knowing that he was innocent. He "confessed" because he was allegedly given instructions by the interviewing officers that he would not be held accountable for the murder. Mr. White stated, " I was told ... that it would go better for me if I helped them [the officers]."

Probation records dated 4/25/98 indicated that Mr. White scored a 3 in a test designed to predict whether he would reoffend. The probation score results placed him in a low risk category (minimum risk, 0-7; medium risk, 8-14; and maximum risk, 15+).

Counsel and Mr. White reported that he has maintained the highest level of behavioral responsibility and received no "write-ups" while incarcerated in the TDC. Additional sources of information regarding Mr. White's prison behavior including prison records and interview of prison personnel were not available to this interviewer. *How long has he been incarcerated?*

JUVENILE HISTORY
Records, Mr. White's mother and the defendant indicated that Mr. White had one disciplinary offense while attending high school: he did not "dress out" for an activity in the gymnasium. He reportedly used his mother's car without permission on one occasion.

3

## EDUCATION HISTORY

During high school Mr. White worked and played football. He obtained a grant or scholarship to Wheatley College in 1981. He injured his knee during his first year at college and could no longer play football. He did not return to college after his first year due to poor grades. Of note, in high school Mr. White appeared to perform scholastically above his intellectual abilities, while his poor college performance was commiserate with his baseline, compromised intellectual functioning.

## MEDICAL HISTORY

Witnesses and records are consistent with Mr. White's report that he that he suffered many traumatic brain injuries and at least two episodes of unconsciousness lasting from one-half to two to three hours. He reported no history of physical or sexual abuse.

## PSYCHOLOGICAL TESTING

The results of tests administered by psychologists Robert Yoham and Denis Nelson in or about 1995 revealed that Mr. White had borderline to low average intellectual functioning, a history of chemical dependency and did not suffer from an Antisocial Personality Disorder (ASPD).

Mr. White's test results are statistically unusual for a defendant when compared to other defendants who have similar criminal histories. The test results were obtained when he was incarcerated and probably sober for months. He has obviously demonstrated antisocial behavior, however, considering the fact that he tested negative for this disorder, the most logical explanation to explain the discrepancy is that that his antisocial or aggressive behavior surfaced only when he was intoxicated: without drugs, he is not likely to become aggressive. This hypothesis is substantiated by Mr. White's model behavior during his ___ years of incarceration when he has probably not used cocaine and his lack of antisocial behavior prior to using drugs.

## VOCATIONAL HISTORY

Mr. White reportedly worked throughout high school. His longest period of employment was for three years at Clean America. The owner of Clean America noted that Mr. White was an excellent worker and would be glad to rehire him in spite of his current situation. While he was working at Clean America, Mr. White's left wrist was crushed. The injury resulted in residual pain and disability. He attributed part of his difficulty in finding consistent employment after working at Clean America to the industrial accident.

Mr. White reported that in the years prior to his incarceration, his work ethic deteriorated when he started using drugs daily.

He indicated that he was rejected from the military. He attributed the rejection to poor performance on the recruitment screening.

4

## FAMILY HISTORY

Mr. White was raised in Houston by his mother, as were his six siblings. Except for a total of 3-4 years when she received government assistance, his mother reportedly worked. Mr. White met his father for the first time when he was age 18 and reported that he has enjoyed a close relationship with him since then. Records and Mr. White indicated that his father was gainfully self-employed as an automobile mechanic.

The only family member reported to abuse substances, other than the defendant, was his brother. There are no reports of antisocial behavior in the family other than Mr. White's.

Mr. White revealed that he had supported his common-law wife and his three children by that union. Ms. DeShanta Flowers confirmed Mr. White's report. She indicated that Mr. White lived with her and their dependent children (currently ages 9, 10 and 19) from 1989 until the time of Mr. White's incarceration in 1995. She added that during that time, Mr. White was the sole financial support of the family and was a devoted father who was actively involved with her and child rearing. Ms. Flowers denied any awareness of Mr. White's criminal behaviors during that time.

## MENTAL STATE EXAMINATION DURING THE INTERVIEW OF 1/3/02

Mr. White was interviewed in the attorney's booth of Death Row. A thick, transparent window separated the defendant from this examiner. The interview took place by telephone.

The defendant's mental state was consistent with that of a non-psychotic individual with limited intellectual functioning. He appeared resigned, sad and withdrawn. He denied or minimized the accuracy of the report of psychotic symptoms that were contained in the Harris County Jail records. When asked to clarify some of the statements that clearly indicated that he was hallucinating in jail he stated that he, "...didn't believe it ... wasn't there ... can't say." His ability to store, recall and abstract information was impaired and consistent with an individual with low average intellectual functioning. He reported that at times, his thoughts would somehow be transmitted by the radio and that he was uncertain whether individuals could control his mind.

## CLINICAL ASSESSMENT

Mr. White has a strong history of a Chemical Dependency Disorder, compromised intellectual functioning, possibly a psychotic disorder and a history of significant head trauma and loss of consciousness. Tests and interviews revealed that he has no antisocial personality traits when he is not intoxicated.

## RELAPSE RESEARCH

Some data suggests that after cocaine users stop using; the cognitive effects of the drug can produce short- term (weeks) and longer-term effects (months) on brain functioning. Memory deficits may persist for months and may become irreversible. Cocaine abusers have impairments in visuospatial abilities, concentration and disruptions in neural

5

pathways. These factors have recently been demonstrated to be associated with an increased risk for cocaine users to relapse. even when they have been sober for months.

## FUTURE VIOLENT ACTS RESEARCH
Research into the prediction of violence by criminal offenders has resulted in a number of predictive tools or tests. These tests include, among others, the Violent Risk Assessment Guide (VRAG), the Sex Offender Risk Appraisal Guide (SORAG), the Courmier-Lang System for Quantifying Criminal History, and the Iterative Classification Tree (ICT). The most compelling data that validate these tests were not available at the time of trial and have been published since 1998.

In this examiner's opinion, most of these tests would predict that Mr. White would be at a low to very low risk to reoffend.

## RECOMMENDATIONS AND SUPPLEMENTAL LITERATURE REVIEW
This examiner recommends that Mr. White be treated for chemical dependency and monitored for relapses as discussed below under *Treatment of addiction*. The probability of success is higher because he lacks three negative characteristics: the predictors of institutional aggression, the early onset of juvenile delinquent behavior, and family deviance and disruption experienced before age 11.

Factors that make successful rehabilitation more likely include the late onset of the defendant's drug usage. The accuracy of his report to this examiner was consistent with information contained in his records. Statistical studies strongly support the unlikelihood of his committing future violent acts if her were to maintain sobriety. All of these topics are discussed below.

### Treatment of addiction
The frequent use of crack cocaine, consistent with Mr. White's records and self-report, is associated with the commission of more illicit activity, especially violence.

The diagnosis and treatment of cocaine addiction has become more successful. Treatment in therapeutic communities has resulted in complete abstinence or a significant reduction in the usage of intoxicants by two-thirds of patients. Successfully treated patients are arrested less frequently when compared to their baseline rates. Boot camp has also been demonstrated to be an effective treatment modality.

Moreover, successfully treated, criminally convicted addicts have been shown to improve their psychosocial functioning and employment histories.

As Mr. White's history is consistent with an individual who does not commit aggressive acts unless under the influence of cocaine, should he maintain sobriety, the likelihood that he will commit future violent acts would be significantly decreased, when compared to his baseline rate of aggressive behavior.

6

In addition, the likelihood of Mr. White's committing future violent acts could be decreased even further if:

1. his behavior could be monitored and interventions made to prevent progression to violence. This modality is well documented in the literature regarding the treatment of chemical dependency and is termed "relapse prevention." In the majority of cases, the prodromal behavior that resulted in a violent act occurs over a period of weeks to months.

2. his urine could be tested to monitor the use of cocaine. Should Mr. White relapse, the metabolites of cocaine would be detectable in his urine for days. Detection of the metabolites would allow for an early diagnosis of relapse. Early diagnosis would facilitate active intervention that might prevent further usage and its influence on Mr. White's behavior

Utilizing the monitors named in the preceding points should result in an even more significant decrease in the likelihood of Mr. White's committing future violent acts than if either monitor were utilized alone.

*Predictors of institutional aggression*

Research indicates that Mr. White's reported lack of offensive behavior while incarcerated, decreases the likelihood that he will commit future institutional violence.

*Early onset of juvenile delinquent behavior*

The early onset of juvenile delinquent behavior is a strong, positive predictor of future criminal behavior. In fact the diagnosis of an ASPD cannot be made unless the individuals manifests significant aggressive behavior prior the age 15. Mr. White's adolescent history, on the other hand, is characterized by two relatively minor events: not "dressing out" for gym and borrowing his mother's car without permission. By inference, Mr. White's lack of significant, early onset juvenile delinquent behavior would place him at low risk to commit future violent acts.

*Family deviance*

Family deviance and disruption experienced before age 11 have been significantly associated with crime severity. Mr. White's family history of a consistent income, relatively stable home environment relatively free of drugs and alcohol, and no antisocial behavior reported in family members decreases the likelihood of his committing future violent acts. Mr. White's history of consistent financial support and ongoing family involvement between the years 1989-1995, as related by him and his common-law wife, are in this examiner's opinion very unusual and statistically unlikely. Prognostically, his ability to support and stayed involved with his family makes it more likely that he could maintain sobriety.

*Late onset of drug usage*

Late onset drug usage has been shown to be more amenable to treatment than early onset usage. Mr. White's reported use of drugs starting after high school places him in a group of individuals who might be more successfully treated than those who start taking drugs at younger ages.

*Accuracy of self-report to this examiner*
During the interview with this examiner, Mr. White demonstrated an unexpected level of accuracy and consistency. This examiner believes that responding in this manner is a statistically unusual and clinically favorable indicator of his ability to be rehabilitated.

*Work ethic and family support*
Mr. White demonstrated a responsible work ethic in high school and afterward at Clean America. His motivation is a mitigating risk factor. If rehabilitated, he might return to work. *Can put the family support back in if it is confirmed by another source.*

In addition, his favorable family history and the ongoing support of his family are unusual in murderers and could contribute to the likelihood of a successful rehabilitation. *Is it accurate to say that it is unusual for family members to support murderers?*

*Statistical studies of recidivism*
The studies illustrated in the appendix to this report clearly indicate that:
1. Capitol murders that are released into the community are at a decreased likelihood to reoffend when compared to non-capitol murderers and individuals who are placed in the prison general population. See Figure 1.
2. Aging significantly decreases the likelihood that individuals will commit future antisocial acts either in the community or while imprisoned: it less likely that Mr. White would reoffend if he were released today, six years after committing the alleged offense, and the risk would decrease even further if he were kept in prison longer and then released. See Figures 2, 3, and 4.
3. There are fewer serious, violent, prison rule violations among death row releasees than among other prisoners. See Figure 5.

DELIBERATENESS
Given Mr. White's chemical dependency history, his ability to deliberate or engage in deliberative thought at the time of this offense would have been seriously compromised due to the high likelihood of organic impairment and decreased ability to think caused by his heavy cocaine use.

FUTURE DANGEROUSNESS
The fact that he is older in addition to the decreased likelihood that he would use drugs if his behavior and urine were monitored, would in all medical probability, decrease the likelihood that he would commit future violent acts. The decreased likelihood is compared to Mr. White's baseline offense rate and those of other capitol and non-capitol offenders.

CONTRIBUTION OF ORGANICITY TOWARD MR. WHITE'S CRIMINAL BEHAVIOR
It is the clinical experience of this examiner, confirmed by some research findings not available until the past few years, that Mr. White's compromised intellectual functioning

8

increases his risk of being effected by illicit substances. He would have been more likely to be effected than a person without such impairment.

FORENSIC CAVEATS AND CONCLUSIONS

Please note that violent behavior predictors are reliable for groups of individuals who share similar histories. The prediction of behavior for any one individual is either unreliable or fraught with many false positives. Otherwise stated, the prediction of violent behavior for any individual is highly inaccurate if cognitive tests are the sole source of the prediction.

However, what is clear is that a prediction of violence with a greater than 50 per cent likelihood, will be wrong at least 10 per cent of the time. Differently stated, if a prediction of violence was accurate for five individuals, more that one other individual would have been incorrectly predicted to reoffend.

FORENSIC CONCLUSIONS

The likelihood that Mr. White will reoffend and commit a serious crime or violent act, is in all medical probability, less likely than the rate at which he committed violent acts prior to his incarceration. This conclusion is based on the fact that Mr. White is older than when he committed the violent acts and the likelihood of his committing future violent acts would be significantly decreased even further if he maintains sobriety. Moreover, the longer he remains in prison without committing a violent incident, the less likely it is that he will commit future violent acts and present an ongoing threat if he were to be released into the community. He is also less likely to commit future violent acts than non-death row inmates who continue to be incarcerated or are released into the community.

These medically based opinions apply if the factors identified in this report are accurate, if this examiner's clinical experiences are applicable to Mr. White, and if the interventions suggested by this examiner are instituted.

It is the hope of this examiner that the information contained in this report assists the court in its determination of Mr. White's future dangerous behavior, his ability to deliberate at the time of his offense, and the potential mitigation offered by the organic damage to his brain caused by prolonged cocaine use.

This examiner defers to the court for the ultimate answer to the likelihood of the defendant's committing criminal acts of violence that would constitute a continuing threat to society if he were released into the community, and to the determination of the legal consequences of these facts.

Please call 713-528-1188 with questions regarding this report.

Seth W. Silverman, M.D.

APPENDIX

All illustrations are from "Integrating Base Rate Data in Violence Risk Assessments in Capital Sentencing" by Mark D. Cunningham, Ph.D., and Thomas J. Reidy, Ph.D. Their article was published in *Behavioral Sciences and the Law*, Vol. 16, pages 71-95, (1998). Permission to reproduce the illustrations has been requested.

The illustrations have been renumbered below to correspond to the order in which they are referred to in this examiner's report.

- Figure 1. Base rates of parole recidivism of capitol murderers, murderers, and general population inmates (Cunningham and Reidy, p.81)
- Figure 2. Community prevalence of violent behavior by age (Cunningham and Reidy, p. 85)
- Figure 3. Age distribution of criminal offenders in the general population of the United States 1977 (Cunningham and Reidy, p. 84)
- Figure 4. Incidence of prison infractions in NY, 1975, by age (Cunningham and Reidy, p. 86)
- Figure 5. Reported serious violent prison rule violations (Cunningham and Reidy, p. 78)

FURTHER, AFFIANT SAYETH NAUGHT.

_____
SETH W. SILVERMAN, M.D.


SWORN TO AND SUBSCRIBED BEFORE
ME THIS _3_ DAY OF MAY, 2002.

_____
NOTARY PUBLIC

___ Personally known to me, or
_✓_ Produced identification:

Type of Identification Produced:

_TDL_____

Figure 1. Base rates of parole recidivism of capitol murderers, murderers, and general population inmates

Base rates of violence in capital sentencing

Unofficial Copy Office of Marilyn Burgess District Clerk

| Study | Sample | Follow-up Interval | N | Recidivism Rate | New Murder Rate |
|---|---|---|---|---|---|
| **Capitol Murderers** | | | | | |
| Marquart & Sorensen (1989) | National Sample | 1973-87 | 188 | .20-prison/.10-new felony | .005 |
| Bedau (1964) | NJ | 1907-60 | 31 | .03 new felony | 0 |
| Bedau (1965) | OR | 1903-64 | 13 | .20 return to prison | 0 |
| Vito & Wilson (1988) | KY | 1972-85 | 17 | .29 return to prison, 6 jailed | 0 |
| Wagner (1988) | TX | 1924-88 | 84 | .08 new felony | 0 |
| Stanton (1969) | NY | 1930-61 | 63 | .05 return to prison | 0 |
| **Non-Capitol Murderers** | | | | | |
| Donnelly & Bala (1984) | NY | 1977, 5 yr post-release | 64 | .27 return to prison | — |
| Bedau (1982) | 12 States | 1900-76, 1-33 yr post-release | 2646 | .03 new felonies | .006 |
| Bedau (1982) | Nationwide | 1965-69, 78-75, 1st yr of release | 11,404 | .015 major violations | .003 |
| Bedau (1982) | Nationwide | males, 1st yr of release | 6094 | .01 new felony | .002 |
| Stanton (1969) | NY | females, 1st yr of release | 756 | .004 new felony | .001 |
| Beck & Shipley (1989) | 11 States | 1983, 3 yr post-release | 514 | .22-prison/.03-new felony | .004 |
| | | | 508 | .21 return to prison | .07 |
| Eisenberg (1991) | TX | 1986, 5 yr post-release | 56 | .45 return to prison | reconstructed |
| Perkins (1994) | 29 States | parole discharge 1992 | 5371 | .33 return to prison | — |
| Cacenini (1996) | NY | 1985-91, 5 yr post-release | 5054 | .24 return to prison | .024 |
| **General Prison Population** | | | | | |
| Beck & Shipley (1989) | 11 States | 1983, 3 yr post-release | 16,355 | 41.4 return to prison | .03 |
| Perkins (1994) | 29 States | parole discharge 1992 | 209,993 | .46 return to prison | reconstructed |
| Eisenberg (1991) | TX | 1986, 5 yr post-release | 1539 | .48 return to prison | — |
| Cacenini (1993) | NY | 1985-91, 3 yr post-release | 121,555 | .44 return to prison | .004 |

Figure 2. Community prevalence of violent behavior by age



Base rates of violence in capital sentencing

Figure 3. Age distribution of criminal offenders in the general population of the United States 1977



Figure 4. Incidence of prison infractions in New York, 1975, by age



Figure 5. Reported serious violent prison rule violations



# AFFIDAVIT

| THE STATE OF TEXAS | § | KNOWN ALL MEN BY |
|---|---|---|
| THESE | | |
| | § | PRESENT |
| COUNTY OF HARRIS | § | |
| | § | |

BEFORE ME, the undersigned authority on this day personally appeared SETH W. SILVERMAN, M.D., of 3614 Stoneham, Houston, Texas, known to me to be the person whose name is subscribed below, who, after having first been duly sworn by me, on oath deposes and says:

1. My name is Seth W. Silverman, M.D., and I am of sound mind and I capable of making this affidavit.

2. I am a licensed practicing physician who is Board Certified in Adult, Adolescent, Addiction, and Forensic Psychiatry.

3. I have been requested by habeas counsel to consult in the case of *State of Texas v. Garcia Glen White*.

4. I have reviewed the trial transcripts and the reports from the psychiatrist who testified at trial.

5. I have interviewed Mr. White and talked to his family members.

6. Mr. White has a significant history of multiple head traumas, multiple episodes of unconsciousness secondary to head trauma, impaired cognitive and intellectual functioning and possibly a thought disorder. (His thought disorder is evidenced by his responses that someone might be able to control his mind. Mr. White also reported that the TV could predict the future.)

7. The definitive tests to determine the extent of his psychiatric and neurological disorders are the Rorschach Test and Halsted-Reitan Test.

8. Based upon the information I have reviewed, Mr. White also requires a complete neurological examination that would include additional diagnostic tests as determined by the results of the examination.

9. Further neurological testing could also verify and explain Mr. White's organic impairment. His impairment is in part, responsible for Mr. White's unusual susceptibility to pharmacologically induced psychosis.

10. It is my opinion that this evidence is highly relevant to predicting Mr. White's future violent behavior.

11. I have not been compelled, threatened, or coerced to sign this affidavit in any manner. Furthermore, I have not been offered any bribe or improper inducement as a benefit or reward for signing this affidavit. My action in signing this affidavit is knowingly, voluntarily, and freely undertaken on my part.

"Further Deponeth sayeth not."

_____

SETH W. SILVERMAN, M.D.

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared SETH W. SILVERMAN, M.D., known to me to be the person whose name is subscribed to the foregoing instrument an acknowledged to me that he executed the same for the purpose and consideration therein expresses.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the
03 day of _May_____, 2002.

ZULEMA PLATA
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
JANUARY 6, 2004

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS
MY COMMISSION EXPIRES:

Jan 6, 2004.
_____

# APPENDIX "Q"

Wilkie A. Wilson, PhD
302 Watts St.
Durham, NC 27701
January 19, 2015

Patrick F. McCann
Law Offices of Patrick F. McCann
909 Texas Ave, Ste. 205
Houston, Texas 77002

Mandy Miller
Mandy Miller Legal, PLLC
2910 Commercial Center Blvd.,
Ste. 103-201
Katy, TX 77494

Dear Mr. McCann and Ms. Miller:

     This letter is in reference to the case of Garcia Glen White. You asked me to review this case from the standpoint of the effects that the recreational drugs cocaine and marijuana could have had on Mr. White at the time of the crimes for which he is accused. In particular you asked that I consider what scientific findings have emerged since he was examined by the psychiatrist, Dr. Silverman, in 2002 and the psychologist Dr. Averill in 2008.

     I am a neuropharmacologist at Duke University in Durham, North Carolina and a Professor of Prevention Science in the Social Sciences Research Institute. I hold a B.S.E.E. from Louisiana State University and a Ph.D. from Duke University. Until 2009, I was a Research Professor of Pharmacology at Duke University Medical School, and an Associate Professor of Medicine until 2010. Additionally, until December 31, 2010, I served as a Research Career Scientist for the Veterans Health Service at the VA Medical Center in Durham, North Carolina. I still serve the VA in a "without compensation" position.

     I continue to conduct scientific research concerning the effects of drugs on brain function in collaboration with other scientists. I am currently funded by the National Institute of Health through grants to study alcohol and nicotine. As of July 1, 2012, I, along with colleagues, have funding from the United States Department of Education Institute of Educational Sciences to develop brain-related educational programs for high school students. I have written numerous research papers. In addition, I have co-authored three books that explain the effects of recreational drugs to members of the public who are not scientists. The lead book of the series is *Buzzed: The straight facts about the most used and abused drugs from alcohol to ecstasy* (WW Norton, 1998, 2003, 2008, 2014). In this book we discuss the effects of cocaine and marijuana on the brain and behavior.

     I also teach members of the criminal justice community, about neuropharmacology, addiction, and recreational drugs at the School of Government at the University of North Carolina. I have testified in criminal proceedings as an

expert in neuropharmacology in North Carolina, Louisiana, Texas, and Florida. I have consulted on other cases in Tennessee, Georgia, and Virginia.

## Sources of Information about this case
- Two reports from Dr. Silverman in 2002
- A report of a psychological examination by Dr. Averill
- A report of a psychological examination by Dr. Brown

## The issue of cocaine and psychosis following its use

First you asked that I consider whether Mr. White could have suffered from cocaine-induced psychosis that far outlasted his last dose of cocaine. The report of Dr. Silverman indicates that Mr. White showed symptoms of psychosis while he was incarcerated after arrest, but that these symptoms had abated by the time he was examined by Dr. Silverman in 2002. At the time of the reports by Dr. Silverman (2002) and Dr. Averill (2008), there was a literature that discussed some association of cocaine with psychosis and violence. However at that time the medical community did not know the *probability* of cocaine inducing psychosis.

In 2009, a paper entitled "Prevalence of psychotic symptoms in substance users: a comparison across substances was published by MJ Smith, et.al. (Comprehensive Psychiatry 50 (2009) 245-250). In the introduction to that paper they write:

*To our knowledge, no study has reported the prevalence of psychotic symptoms in relation to the use of specific substances among an out-of-treatment sample of substance users. Thus, our study examines (1) the rate of substance abuse and dependence in the sample; (2) the prevalence of psychotic symptoms among users of specific substances; and (3) the risk of psychotic symptoms as a consequence of amphetamines, cannabis, cocaine, and opioids.*

They found, as shown in their Table 2, that in their study population, 77.7% of cocaine users with moderate dependence experienced psychotic symptoms, and 88.7% of those with severe dependence experienced psychotic symptoms. In Table 3 they calculated the odds of psychosis associated with moderate and severe dependence, and they found moderate dependence produced and odds ratio of 47 and an odds ratio of 114 for severe dependence. Taken together these data indicate that it is highly probable that a regular user of cocaine will experience psychotic episodes.

The authors also evaluated cannabis users in a like manner. Table 2 shows that 48% of mildly dependent users, 78.6% of moderately dependent users, and 80% of severely dependent users experienced psychotic symptoms.
According to these authors, this is the first research to quantitate these effects of cocaine and marijuana. These levels of probability were almost certainly not known in 2002 or in 2008.

## The issue of marijuana use by Mr. White

Mr. White indicated that he initiated marijuana use before his use of cocaine. While Dr. Silverman and Dr. Averill noted this, they paid little attention to it and apparently did not probe Mr. White to discuss his marijuana use. That is unfortunate, because, as described above, in 2009 research showed that marijuana use is strongly associated with psychosis.

Marijuana (cannabis) is a complicated drug, and particularly in ways that were not familiar to the general medical community in 2002 or in 2008. It has a reputation for making people mellow and reducing aggression during acute intoxication, so perhaps Mr. White and the clinicians likely thought it was not a significant contributor to his violent behavior.

However, in the years since that period, a new understanding of the effects of cannabis has occurred—*the importance of cannabis withdrawal*. The active component of cannabis is the well-known compound, THC. THC has a very long half-life in humans and this leads to the development of tolerance in regular users. When a person is tolerant to a drug, and that drug is withdrawn, then the person experiences withdrawal effects that can be extremely unpleasant, and that will produce behaviors essentially the opposite of those that occur during intoxication. For example, when an alcoholic withdraws from alcohol acutely, he/she will experience remarkable excitation of the central nervous system that can result in epileptic seizures and death if untreated.

With marijuana, neither intoxication nor withdrawal is fatal, but the withdrawal phase can activate aggression and other unpleasant sensations. These effects were not noted in the DSM series until the publication of the DSM-V in 2013.

There have been were two papers published in the journal Psychiatric Times that address the timing of the general acceptance of this issue. The first, *"Does Marijuana Withdrawal Syndrome Exist?"* (Psychiatric Times, February 1, 2002) opens the discussion of this issue. The second, published in 2011, is entitled, *"Marijuana Withdrawal Syndrome: Should Cannabis Withdrawal Disorder Be Included in DSM-5?"* (Psychiatric Times, April, 28, 2011). In fact, the DSM-V finally does include marijuana withdrawal.

Leading up to this were a number of publications that slowly revealed the importance of this phenomenon. The state of the literature in 2002 was made clear with a review article by Neil Smith entitled *"A Review of the Published Literature Into Cannabis Withdrawal Symptoms in Human Users"* (Addiction, 97, 621-632) concluded:

*"It is concluded that more controlled research might uncover a diagnosable withdrawal syndrome in human users and that there may be a precedent for the introduction of a cannabis withdrawal syndrome before the exact root is known."*

Thus in 2002, there was no professional guidance for Dr. Silverman. By 2008 the literature was evolving, but there was no consensus about withdrawal. A paper published by DS Hasin, et. al. entitled, *" Cannabis Withdrawal in the United States: A general Population Study"* (Journal of Clinical Psychiatry, 2008 September; 69 (9): 1354-1363) introduced the issue with:

*"Although cannabis is the most widely abused illicit drug, little is known about the prevalence of cannabis withdrawal, its factor structure, clinical validity and psychiatric correlates in the general population."*

And concluded:

*"Cannabis withdrawal was prevalent and clinically significant among a representative sample of frequent cannabis users. Similar results in the subset without polysubstance abuse confirmed the specificity of symptoms to cannabis. Cannabis withdrawal should be added to DSM-V and the etiology and treatment implications of cannabis withdrawal symptoms investigated."*

Thus between 2002 and 2008, there was little knowledge and acceptance of the problem of marijuana withdrawal and little understanding of the consequences of an interaction of marijuana withdrawal

However, by 2013 cannabis withdrawal was in the DSM-V. Also, in 2013, PH Smith, et.al, published a paper entitled *"Marijuana Withdrawal and Aggression Among a Representative Sample of U.S. Marijuana Users."*(Drug and Alcohol Dependence 132 (2013) 63-68).

They concluded:

*"The findings from this study support the notion that laboratory-based increases in aggression due to marijuana withdrawal extend to the general population of marijuana users who have a previous history of aggression."*

That is, if a person is in a state in which he/she is potentially aggressive, and, if that person is in marijuana withdrawal, then that aggression may be expressed.

### The Issue of Cocaine and Marijuana Withdrawal

As discussed above, cocaine makes individuals aggressive, possibly violent, and leads to psychosis. Adding marijuana withdrawal to this state might well make the difference between experiencing feelings of aggression and actually expressing them.

It is clear that Mr. White was abusing cocaine and according to Dr. Silverman, the jail noted residual psychosis. It is also clear that he used marijuana. Thus, with hindsight, both Dr. Silverman and Dr. Averill could have investigated Mr. White's use of marijuana, his tendency to go into withdrawal, and the behaviors he exhibited in the state of cocaine intoxication and marijuana withdrawal. Unfortunately the need for this investigation was not clear to either doctor. Neither the DSM-IV nor the current medical literature to which they had access guided them in this direction.

Sincerely yours,

*Wilkie A. Wilson, PhD*

Wilkie A. Wilson, PhD
Neuropharmacologist and
Professor of Prevention Science
Duke University Social Sciences Research Institute

Unofficial Copy Office of Marilyn Burgess District Clerk

# APPENDIX "R"

87R3224 AJZ-D

By:  Moody, Thompson of Harris, Collier,                    H.B. No. 275

    Leach, Murr, et al.

## A BILL TO BE ENTITLED

## AN ACT

relating to an application for a writ of habeas corpus based on certain relevant scientific evidence that was not available at the applicant's trial.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Article 11.073(b), Code of Criminal Procedure, is amended to read as follows:

(b)  A court may grant a convicted person relief on an application for a writ of habeas corpus if:

(1)  the convicted person files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:

(A)  relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

(B)  the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of

the application; and

      (2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted <u>or would have received a different punishment</u>.

      SECTION 2. Article 11.073, Code of Criminal Procedure, as amended by this Act, applies only to an application for a writ of habeas corpus filed on or after the effective date of this Act. An application filed before the effective date of this Act is governed by the law in effect when the application was filed, and the former law is continued in effect for that purpose.

      SECTION 3. This Act takes effect December 1, 2021.

# APPENDIX "S"

By: Moody                                                    H.B. No. 205

A BILL TO BE ENTITLED

AN ACT

relating to an application for a writ of habeas corpus based on certain relevant scientific evidence that was not available at the applicant's trial.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Article 11.073(b), Code of Criminal Procedure, is amended to read as follows:

(b)  A court may grant a convicted person relief on an application for a writ of habeas corpus if:

(1)  the convicted person files an application, in the manner provided by Article 11.07, 11.071, or 11.072, containing specific facts indicating that:

(A)  relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

(B)  the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of

the application; and

      (2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted or would have received a different punishment.

      SECTION 2. Article 11.073, Code of Criminal Procedure, as amended by this Act, applies only to an application for a writ of habeas corpus filed on or after the effective date of this Act. An application filed before the effective date of this Act is governed by the law in effect when the application was filed, and the former law is continued in effect for that purpose.

      SECTION 3. This Act takes effect December 1, 2023.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Julia Bella
Bar No. 24035099
julia@jbellalaw.com
Envelope ID: 91285500
Filing Code Description: Writs
Filing Description: 11.071 Application for WHC 6th
Status as of 8/26/2024 10:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patrick McCann | 792680 | writlawyer@outlook.com | 8/23/2024 6:17:42 PM | SENT |
| Julia Bella | 24035099 | julia@jbellalaw.com | 8/23/2024 6:17:42 PM | SENT |
| Joshua Reiss | | REISS_JOSH@dao.hctx.net | 8/23/2024 6:17:42 PM | SENT |
| Farnaz Hutchins | | HUTCHINS_FARNAZ@dao.hctx.net | 8/23/2024 6:17:42 PM | SENT |