Nos. 24-70005, 24-20428

I<small>N THE</small>
# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤 𝕗𝕠𝕣 𝕥𝕙𝕖 𝔽𝕚𝕗𝕥𝕙 ℂ𝕚𝕣𝕔𝕦𝕚𝕥

GARCIA GLENN WHITE,

*Petitioner–Appellant*

*v.*

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent–Appellee*

consolidated with

In re GARCIA GLENN WHITE,

*Movant.*

## OPPOSITION TO MOTION FOR AUTHORIZATION AND MOTION FOR A STAY OF EXECUTION

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

JEFFERSON CLENDENIN
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
jay.clendenin@oag.texas.gov

*Counsel for Respondent*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent*
> Bobby Lumpkin, Director
> TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*
> Jefferson Clendenin, Deputy Chief, Criminal Appeals Division
> OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Movant*
> Garcia Glenn White

*Counsel for Movant*

Patrick McCann
700 Louisiana Street, Suite 3950
Houston, Texas 77002
writlawyer@outlook.com

Julia Bella
503 FM 359, Suite 130
Richmond, Texas 77406
julia@jbellalaw.com

> s/ Jefferson Clendenin
> JEFFERSON CLENDENIN
> Assistant Attorney General

i

## TABLE OF CONTENTS

INTRODUCTION.................................................................1

STATEMENT OF JURISDICTION.....................................2

STATEMENT OF THE ISSUE...........................................2

STATEMENT OF THE CASE.............................................2

    I.     Facts of the Crime..........................................2

    II.    Evidence Pertaining to Punishment................................5

          A.  Evidence presented by the State.......................5

          B.  Evidence presented by the defense....................9

    III.   Procedural History...........................................11

SUMMARY OF THE ARGUMENT...................................15

STANDARD OF REVIEW................................................15

ARGUMENT..................................................................16

    I.  White's Motion Does Not Meet the Standards under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.............16

         A.  White's claim that he is innocent of the death penalty has been raised and rejected before.........18

         B.  None of White's claims are based on a previously undiscoverable factual predicate.......................19

         C.   None of White's claims satisfy § 2244(b)(2)(A)....21

1. White's claim of innocence of the death penalty and his "weighing" claim are not based on new retroactively applicable rules of constitutional law..........................................................21

2. White's *Atkins* claim is barred under § 2244(b)(2)(A) because it does not rely on a new retroactive rule of constitutional law that was previously unavailable...............................24

    a. *Moore I* is not retroactively applied...........25

    b. *Atkins* was not previously unavailable......30

3. White's claim fails on the merits..................33

II. The Statute of Limitations Precludes Authorization............38

III. This Court Should Deny White's Request for a Stay of Execution......................................................................42

CONCLUSION.................................................................45

CERTIFICATE OF SERVICE..............................................47

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)............48

ELECTRONIC CASE FILING CERTIFICATIONS..................48

# TABLE OF AUTHORITIES

**Cases**                                                     **Pages**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) ...................................... 15

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................... 26, 27

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ................................................. 42

*Brumfield v. Cain*, 808 F.3d 1041 ............................................................ 37

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ............................................... 44

*Busby v. Davis,* 925 F.3d 699 (5th Cir. 2019) ............................ 33, 34, 36

*Dunn v. Reeves*, 594 U.S. 7317 (2021 ...................................................... 37

*Ex parte Andrus*, 622 S.W.3d 892 (Tex. Crim. App. 2021) ......... 23, 24, 40

*Ex parte Blue,* 230 S.W.3d 151 (Tex. Crim. App. 2007) ......................... 33

*Ex parte Cathey*, 451 S.W.3d 124 (Tex. Crim. App. 2015 ........... 36, 37, 38

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) .................. 40

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) .................. 40

*Ex parte White,* 506 S.W.3d 39 (Tex. Crim. App. 2016)................... 13, 14

*Ex parte White*, 2015 WL 375733 ........................................................... 13

*Felker v. Turpin*, 518 U.S. 651 (1996) .................................................... 15

*Fulks v. Watson*, 4 F.4th 586 (7th Cir. 2021) ......................................... 30

*Gomez v. U.S. Dist. Court for Northern Dist of California,* 503 U.S. 653
(1992) ............................................................................................ 43

*Green v. Lumpkin*, 860 F. App'x 930 (5th Cir. 2021) ............................ 36

*Gutierrez v. Saenz*, 93 F.4th .............................................................. 22, 23

*Gutierrez v. Saenz*, 144 S. Ct. 2718 (2024) .............................................. 21

*Gutierrez v. Saenz*, 565 F. Supp. 3d 892 (S.D. Tex. 2021) ................ 22, 40

*Hall v. Florida*, 572 U.S. 701 (2014) ...................................................... 29

*Henderson v. Thaler*, 626 F.3d 773 (5th Cir. 2010) ............................... 20

H*ill v. Anderson, 8*81 F.3d 4837 (6th Circuit 2018................................. 27

*Hill v. McDonough,* 547 U.S. 573 (2006) .......................................... 42, 44

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ............................................. 43

*In re Burton*, 111 F.4th 664 (5th Cir. 2024) .......................... 20, 29, 38, 41

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ........................... 17, 33, 39

*In re Cathey, 8*57 F.3d 2216 (5th Cir. 2017 ................................... *passim*

*In re Halprin*, 788 F. App'x 9414 (5th Cir. Sept. 23, 2019 ..................... 33

*In re Johnson 9*35 F.3d 2841 (5th Cir. 2019 .................................. *passim*

*In re Jones,* 998 F.3d 187 (5th Cir. 2021) ......................................... 39, 41

*In re Mathis*, 483 F.3d 395 (5th Cir. 2007) ............................................ 36

*In re Payne*, 722 F. App'x 534 (6th Cir. 2018) .................................. 29, 30

*In re Richardson*, 802 F. App'x 750 (4th Cir. 2020)................................30

*In re Sol,* 938 F.3d 20203 (5th Cir. 20......................................................32

*In re Sparks*, 939 F.3d 630 (5th Cir. 2019) .......................................29, 41

*In re Webster*, 605 F.3d 256 (5th Cir. 2010)............................................19

*In re White*, 602 F. App'x 954 (5th Cir. 2015) ...................................13, 24

*Kelly v. Quarterman*, 296 F. App'x 381 (5th Cir. 2008)..........................22

*Lookingbill v. Cockrell,* 293 F.3d 256 (5th Cir. 2002)............................41

*Moore v. Texas*, 581 U.S. 1 (2017) ........................................20, 34, 35, 37

*Moore v. Texas,* 586 U.S. 133 (2019) .......................................................41

*Murphy v. Nasser*, 84 F.4th 288 (5th Cir. 2023)......................................23

*Nelson v. Campbell*, 541 U.S. 637 (2004).........................................42, 43

*Nken v. Holder*, 556 U.S. 418 (2009).......................................................43

*Petetan v. State*, 622 S.W.3d 321 (Tex. Crim. App. 2021) ................34, 37

*Saffle v. Parks*, 494 U.S. 484 (1990)........................................................26

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ..................................................21

*Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330 (11th Cir. 2019)

.................................................................................................................30

*Strickland v. Washington*, 466 U.S. 668 (1984)......................................40

*Teague v. Lane,* 489 U.S. 288 (1989)........................................................26

*Tumey v. Ohio,* 273 U.S. 510 (1927) ........................................................ 33

*United States v. Lopez-Velasquez*, 526 F.3d 804 (5th Cir. 2008) ............ 22

*Walker v. Epps*, 287 F. App'x 371 (5th Cir. 2008) .................................. 45

*Weathers v. Davis, 9*15 F.3d 102528 (5th Cir. 2019) ........................ 27, 29

*White v. Texas,* 135 S. Ct. 1510 (2015) .................................................. 13

*White v. Texas*, 583 U.S. 850 (2017) .................................................. 22, 40

*White v. Thaler*, 522 F. App'x ................................................................ 18

*White v. Thaler*, No. H-02-1805, 2011 WL 4625361 (S.D. Tex. Sept. 30, 2011) .......................................................................................... passim

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017) .................................. 30

*Williams v. Thaler,* 602 F.3d 291 (5th Cir. 2010) .................................. 17

**Statutes**

28 U.S.C. § 2244 ................................................................................. 1, 16

28 U.S.C. § 2244(b)(2) ........................................................................ 2, 25

28 U.S.C. § 2244(b)(3)(A) .................................................................... 2, 15

28 U.S.C. § 2244(b)(3)(C) ...................................................................... 16

28 U.S.C. § 2244(d)(1) ........................................................................ 39, 41

Tex. Code Crim. Proc. Art. 11.071, § 5(a) ............................................ 12

Tex. Code Crim. Proc. Art. 11.071, § 5 ...................................... 13, 22, 34

Tex. Code of Crim. Proc. Art. 11.073 ....................................................22

28 U.S.C. § 2244(b) .................................................................. 15, 16, 17

28 U.S.C. § 2244(b)(1) ..................................................................17, 18

28 U.S.C § 2244(b)(2)(A) .............................................................. *passim*

28 U.S.C § 2244(b)(2)(A)–(B ...............................................................17

28 U.S.C § 2244(b)(2)(B) ..............................................................19, 20

28 U.S.C § 2244(d)(1)(D) .....................................................................41

## Rules

Fed. R. of App. Proc. 32(a)…………………………..……………………48

## INTRODUCTION

Garcia White was convicted and sentenced to death in 1996 for the murders of sixteen-year-old twins Annette and Bernette Edwards. He killed Annette and Bernette's mother, Bonita, in the same gruesome attack, and he has also killed Greta Williams and Hai Pham. *White v. Thaler*, No. H-02-1805, 2011 WL 4625361, at *1–2 (S.D. Tex. Sept. 30, 2011). The state trial court scheduled White to be executed after 6:00 p.m. (Central Time) on October 1, 2024.

Thirty-five years after the commission of this crime, thirteen years after completion of White's state and federal litigation, almost ten years after he previously asked this Court for authorization, and seven days before his scheduled execution, White filed a motion for authorization to file a successive petition raising a claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), but arguing previous factual and legal unavailability of such a claim in his first federal habeas petition. He also seeks authorization to raise claims alleging innocence of the death penalty and ineffective assistance of counsel. This Court should deny the motion for authorization because White fails to demonstrate prior unavailability of his *Atkins* claim, and his remaining claims are plainly successive.

Further, the claims White seeks to raise are time-barred, and he fails to state a prima facie *Atkins* claim.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over a motion for authorization to file a successive petition pursuant to 28 U.S.C. § 2244(b)(3)(A).

## STATEMENT OF THE ISSUE

Should the Court grant White authorization to file a successive habeas petition in the federal district court pursuant to 28 U.S.C. § 2244(b)(2) for time barred claims that were available during his first federal habeas proceeding and where he fails to state a prima facie *Atkins* claim?

## STATEMENT OF THE CASE

### I.    Facts of the Crime

In late November 1989, Annette, Bernette, and their mother Bonita Edwards were found inside their apartment, one just inside the front door, one in the dining area, and one in a bedroom. 15 RR 60.[1] Annette

---

[1]    "RR" refers to the "Reporter's Record," the transcribed proceedings of White's trial, preceded by the volume number and followed by the page number(s) cited. "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "SX" refers to the State's Exhibits admitted at White's trial. "SCHR" refers to

was lying face down semi-nude with her head on a pillow and a blanket partially covering her. 15 RR 75–76. Her twin sister Bernette had a towel wrapped around her neck and shoved into her mouth. 15 RR 85. Bonita was clothed but had blood on her shirt. 15 RR 78, 83. The three women had sustained multiple stab wounds to the neck and chest and had been dead for several days. 15 RR 83–84, 146–47. Although there was no sign of a forced entry into the apartment, the telephone was off the receiver, and it appeared the bedroom door had been forced open. 15 RR 70, 73, 91, 151. It appeared that Annette, who was found in the bedroom, may have been sexually assaulted. 15 RR 153. Moreover, blood was found on the walls and on numerous items in the apartment, including the bathtub and kitchen sink. 15 RR 76–78, 83, 88–100, 109–10, 151.

The initial interviews of witnesses proved to be fruitless, and the crime remained unsolved for nearly six years. 15 RR 153–56. However, in July of 1995, the police finally received a break in the case. During an interview regarding an unrelated murder of a convenience store owner involving White, Tecumseh Manuel, a close friend of White's, told the

---

the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte White*, No. WR-48,152-01.

police that White admitted to killing the Edwards family. 16 RR 185–86, 189–90. Officer Todd Miller took a statement from Manuel on July 20, 1995, and arrested White the following day. 15 RR 190. Miller contacted Sergeant Rudolph because he had been involved in the original investigation of this case, and Rudolph questioned White for several hours during the early morning of July 22, 1995. 15 RR 157–59; 16 RR 193–94. White denied involvement in the murders during the interview and believed the police were lying to him about Manuel implicating him in the crime. 15 RR 161. Miller showed White a portion of the taped statement from Manuel. 15 RR 161; 16 RR 195. Afterwards, Miller asked White if he was ready to tell the truth, and White said he was. 16 RR 195–96.

White then gave a videotaped statement of his version of the murders.  15 RR 162; 16 RR 196. The gist of White's statement was that he and Terrence Moore went over to Bonita's apartment to do drugs and have sex with her. SX 55A. They both tried to have sex with Bonita and, after they failed, Bonita got mad because they would not share the drugs with her. *Id.* A fight ensued, and Moore ended up stabbing all of the

women. *Id.* White acknowledged during the interview that Terrence Moore was no longer alive. *Id.*

The police investigated Moore's death and discovered Moore had been killed on July 25, 1989, four months before the Edwards were murdered. 16 RR 205–06, 224. Miller and Rudolph confronted White with this discrepancy, and then White gave another taped statement. *Id.* at 206–09. In this brief statement, White admitted that he made up the story involving Moore, and he confessed to killing all three women himself. SX 56A. Further, serology and DNA testing revealed that semen found on a beige sheet in one of the bedrooms was consistent with White's DNA, and blood found on the same sheet was consistent with the DNA of either Annette or Bernette. 16 RR 240–41; 17 RR 381–384. DNA retesting conducted in 2006 further incriminated White. ROA.1124–25.

## II. Evidence Pertaining to Punishment.

### A. Evidence presented by the State

During the punishment phase, the State proved White had committed two prior murders, including one capital murder. With regard to the capital murder, Hau Pham, a sixteen-year-old immigrant from Vietnam, testified that on July 13, 1995, two men came into his father's

convenience store and robbed it. 19 RR 33–34. Around 3:00 p.m. that day, Hau heard a scream, and then one of the men grabbed him by the neck and told him to open the register. 19 RR 34–35. Hau recognized the men because they had been in the store earlier in the day. 19 RR 34. One man was "fat," and the other had a medium build. 19 RR 35–36. Hau saw his father, Hai Pham, lying on the floor with blood on him. 19 RR 37. The men took some cigarettes and walked out of the store. 19 RR 38. Hai died several days later from multiple blunt traumas to the head with skull fractures, brain contusions, and associated complications. 19 RR 47, 83–84. Hau was shown photographs of possible suspects and identified White as the "fat" man. 19 RR 46–47, 62–64. Officer Miller then obtained a warrant for White's arrest, and White gave a videotaped statement admitting his involvement in the crime. *Id.* at 64–69. In the statement, White said he grabbed Hai Pham, threw him to the floor, hit him several times, and kicked him in the chest when he tried to get up. SX 98. White was charged with capital murder. 19 RR 65.

With regard to the second offense, several Houston police officers testified that, on November 1, 1989, they were dispatched to an abandoned house. 20 RR 114, 121–22. When officers arrived, White and

Raymond Manuel were at the scene. 20 RR 121. Officer Philip Clark pulled away plywood from one of the windows and saw a body lying in a back room. 20 RR 116. When homicide officer Wayne Wendel arrived, he found the body of a black female, Greta Williams, beaten to death and covered in carpet. 20 RR 122–23, 134. Greta's body was in the early stages of decomposition, and there was evidence of head trauma. 20 RR 129. Broken teeth were by her neck, and blood spatter on the walls indicated that she sustained repeated blows. 20 RR 131–32. An autopsy revealed that Greta had been struck by a blunt object at least ten times and died from trauma to the head, face, chest, and abdomen. 20 RR 189–95.

When White was initially questioned about the incident, he gave a statement in which he admitted seeing Greta walking down the street but denied having anything to do with her murder. 20 RR 178–79. White was charged with the murder, and the case was presented to a grand jury on November 29, 1989. 20 RR 141–42. At that time, however, White was "no billed" because there was insufficient evidence for the grand jury to present the indictment. 20 RR 142. But when the police questioned Tecumseh Manuel about his knowledge of the Hai Pham murder, Manuel

told the police that White told him about his involvement in both the instant case and Greta Williams's murder. 19 RR 67.

The police confronted White with this new information, and White agreed to give another statement regarding his involvement in Greta's death. 20 RR 207–08. White stated that he approached Greta and offered to pay her for sex. SX 116A. They went to the abandoned house and had sex. *Id.* Afterward, White believed that Greta had taken some of his money. *Id.* When he started to walk away, Greta pulled his shirt and started hitting him. *Id.* White hit her hard about three times, and Greta fell to the ground. *Id.* White then rolled Greta up in carpet and left. *Id.* White further stated that he and Manuel came back to the house two weeks later and noticed a foul odor coming from the house. *Id.* Although White knew it was Greta's body that was causing the smell, he told Manuel that it was probably a dead dog, and they ended up calling the dog pound. *Id.* According to White, the health department contacted the police when they found Greta's body inside. *Id.*

## B.    Evidence presented by the defense

White's first two witnesses were his mother and sister, who testified regarding White's childhood, character, family, problems related to

injuries and work, and drug use. 21 RR 230–78. White's mother, Lizzie White, testified that White was a poor student in school but had good conduct records, was only disciplined once, and got along well with his siblings. 21 RR 230–37. White was a starter on the Wheatley High football team, wanted to play college and pro football, and got accepted to Lubbock Christian College to play football. 21 RR 237–39. However, White injured his knee during his first semester, which terminated his football career, and he dropped out of school. 21 RR 239–40. White came back home and, after working several jobs, he got a job with Clean America sandblasting buildings. 21 RR 240–44. Eventually, he was promoted to crew leader. 21 RR 244. However, in March of 1988, he sustained a serious fall on the job and was hospitalized. 21 RR 245–46. The injury resulted in pain and drug use, and White started hanging around drug abusers. 21 RR 246–49. Although White's medical records were not available, records were produced showing White had been admitted and discharged from the hospital around that time. 21 RR 283. Further, although White had three children whom he loved and was separated from his common-law wife, he was a poor provider and was

behind on his child support payments due to his drug use. 21 RR 249–53. Lizzie asked the jury to spare her son's life. 21 RR 254.

Monica Garrett, White's sister, testified to similar effect as her mother. She stated White was a nice brother who got along well with his siblings. 21 RR 271. White had difficulty in school. 21 RR 271. She tried to help White with his grades but to little avail. 21 RR 271–72. Monica and her siblings considered White to be a football hero. 21 RR 272–73.

White then presented two expert witnesses. Robert Yohman, a clinical neuropsychologist, testified that he conducted a battery of tests on White and reviewed records provided by White's attorneys. 21 RR 308–13. Yohman's examination showed, among other things, that White had an IQ of 76, which was in the borderline range of intellectual functioning but not in the range of intellectual disability. 21 RR 315–16. Dennis Nelson, a psychologist, testified that he examined White and conducted various tests on White's intellectual and emotional functioning, as well as his personality. 21 RR 387, 390. According to screening tests, White had an estimated IQ of 85 or 87. 21 RR 391.

On rebuttal, the State presented a probation officer, John Thomas, who stated that on March 20, 1995, White received a probated three-year

sentence for theft. 21 RR 451–52. As part of his alcohol and drug evaluation, he was referred to a program but did not follow through. 21 RR 454–55. Further, although White admitted to using drugs on his personal data sheet, he denied being a drug abuser. 21 RR 453–54.

## III.  Procedural History

White was convicted and sentenced to death for the murder of Annette and Bernette Edwards. CR 5, 222, 233–36, 242–43. The Texas Court of Criminal Appeals (CCA) upheld White's conviction and death sentence on direct appeal. Op., *White v. State*, No. AP-72,580 (Tex. Crim. App. June 17, 1998).

White then filed a state application for a writ of habeas corpus in the trial court. SHCR-01 at 2–109. The trial court entered findings of fact and conclusions of law recommending that White be denied relief. *Id.* at 259–290. The CCA adopted the trial court's findings and conclusions and denied relief. Order, *Ex parte White,* No. WR-48,152-01 (Tex. Crim. App. Feb. 21, 2001). White also filed a second state habeas application, which the. CCA dismissed as an abuse of the writ. Order, *Ex parte White,* No. WR-48,152-02 (Tex. Crim. App. Apr. 24, 2002).

White then filed a federal habeas petition. ROA.287–373. The district court granted White an administrative stay pending the outcome of DNA retesting. ROA.759–60. White later filed two additional state habeas applications, which the CCA dismissed pursuant to Art. 11.071, § 5(a) of the Texas Code of Criminal Procedure. Order, *Ex parte White*, Nos. WR-48,152-03, -04 (Tex. Crim. App. May 6, 2009). Following DNA retesting and the state court's dismissal of those applications, the district court lifted the stay. ROA.786. White filed an amended petition on December 31, 2009, ROA.787–882, after which the Director filed a motion for summary judgment, ROA.1077–116. The district court then granted the Director's motion for summary judgment, denied White's petition, and denied White a certificate of appealability (COA). *White v. Thaler*, 2011 WL 4625361, at *15. Next, White filed an application for a COA, which this Court denied. *White v. Thaler*, 522 F. App'x 226, 236 (5th Cir. 2013), *cert. denied*, 571 U.S. 1133 (2014).

Thereafter, the convicting court scheduled White's execution for January 28, 2015. On January 8, 2015, White filed in the CCA a Motion for Leave to file an Original Petition for a Writ of Habeas Corpus, a Motion for Leave to file a Petition for a Writ of Prohibition, and a Motion

for a Stay of Execution. SHCR-05, -06. The CCA denied White's motions on January 15, 2015. *Id*. White then filed in this Court a Motion for Authorization to File a Successive Federal Habeas Petition, which was denied. *In re White*, 602 F. App'x 954, 958 (5th Cir. 2015).

Subsequently, White filed in state court, on January 19 and January 20, 2015, respectively, a Motion for Leave to File a Petition for Writ of Prohibition and his fourth subsequent state habeas application. SHCR-07, -08. The CCA denied the Motion for Leave to File a Petition for a Writ of Prohibition on January 21, 2015. SHCR-07. The United States Supreme Court ultimately denied certiorari review. *White v. Texas,* 135 S. Ct. 1510 (2015). The CCA issued an order staying White's execution based on the subsequent habeas application. *Ex parte White*, 2015 WL 375733, at *1. The CCA ultimately dismissed the application pursuant to Article 11.071, § 5. *Ex parte White,* 506 S.W.3d 39, 52 (Tex. Crim. App. 2016), *cert. denied*, 583 U.S. 850 (2017).

The state trial court then scheduled White's execution for October 1, 2024. White's appointed counsel, McCann, filed in state court an application for a writ of habeas corpus and a motion to withdraw the trial court's execution order. On September 3, 2024, the state trial court

denied White's motion to withdraw the execution order. The CCA dismissed White's state habeas application and denied his motion for a stay of execution on September 18, 2024. Order, *Ex parte White*, No. WR-48,152-09 (Tex. Crim. App. Sept. 18, 2024). On September 18, 2024, White filed in the CCA a motion for leave to file a petition for a writ of prohibition. The motion for leave and White's request for a stay of execution were denied without written order on September 25, 2024. *In re Garcia White*, Nos. WR-48,152-10, -11 (Tex. Crim. App. Sept. 25, 2024).

On September 13, 2024, outside counsel filed a motion in White's concluded federal habeas proceedings for substitution of counsel and a stay of execution. ROA.1248–81. The district court denied both motions. ROA.2054–70. White has filed a notice of appeal regarding that denial. *White v. Lumpkin*, No. 24-70005 (5th Cir.).

On September 23, 2024, White filed motions for relief from judgment and for a stay of execution. ROA.2005–14. The motions remain pending.

On September 24, 2024, White filed a motion in this Court for authorization to file a successive federal habeas petition. The instant opposition follows.

On September 25, 2025, White filed a civil rights complaint in federal district court. Comp., *White v. Abbott, et al.*, No. 1:24-CV-1136 (W.D. Tex. Sept. 25, 2024). The complaint is pending.

## SUMMARY OF THE ARGUMENT

White is not entitled to authorization under § 2244(b)(2)(A) because he fails to show any of his proposed claims rely on a new, retroactively applied rule of constitutional law. Further, some of his claims were previously denied and therefore cannot be authorized under § 2244(b)(1). Moreover, his proposed *Atkins* claim does not state a prima facie claim for relief and it categorically fails to satisfy § 2244(b)(2)(B), and White's other claims fail to satisfy § 2244(b)(2)(B). White's proposed claims are also significantly untimely. *See* § 2244(d)(1). Accordingly, this Court should deny White's motion for authorization.

## STANDARD OF REVIEW

A habeas petitioner must "obtain leave from the court of appeals before filing a second habeas petition in the district court." *Adams v.*

*Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). Under § 2244(b),

(1)    A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2)    A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

    (A)    the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (B)

        (i)    the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

        (ii)    the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the Applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). As discussed below, White's Motion fails to make a prima facie showing that he satisfies the requirements of § 2244(b). *See* 28 U.S.C. § 2244(b)(3)(C).

## ARGUMENT

### I.     White's Motion Does Not Meet the Standards under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.

White seeks authorization to raise three claims: (1) he is ineligible to be executed under the Eighth Amendment because he is intellectually disabled; (2) DNA evidence and evidence of cocaine psychosis shows he is innocent of the death penalty; and (3) he is entitled to reweighing of aggravating and mitigating evidence. Mot. 1–7. None of the claims satisfy § 2244(b).

Before authorizing a successive petition in the lower court, this Court must determine that White satisfies the statutory prerequisites for a successive habeas petition. *In re Campbell*, 750 F.3d 523, 529–30 (5th Cir. 2014). If a claim has been previously raised, it must be dismissed—there are no exceptions. § 2244(b)(1); *Williams v. Thaler,* 602 F.3d 291, 301 (5th Cir. 2010). If a claim has not been previously raised, it also must be dismissed, unless the movant makes a prima facie showing that his claim: (A) "relies on a new rule of constitutional law, made retroactive to

cases on collateral review by the Supreme Court, that was previously unavailable," or (B) relies on facts that (i) could not have been discovered previously through the exercise of due diligence, and (ii) if proven would "establish by clear and convincing evidence that, but for Constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(A)–(B); *In re Johnson,* 935 F.3d 284, 291 (5th Cir. 2019); *In re Cathey*, 857 F.3d 221, 226 (5th Cir. 2017). White cannot meet these standards.

### A.    White's claim that he is innocent of the death penalty has been raised and rejected before.

White's motion for authorization seeks to raise a claim alleging he is innocent of the death penalty because (1) another male's DNA was found at the crime scene, and (2) he was suffering from cocaine psychosis during the murders.[2] Mot. 4–5. White raised the claim in his initial federal habeas proceedings, and it was rejected. *White v. Thaler*, 522 F. App'x at 232–33; *White v. Thaler*, 2011 WL 4625361, at *4–5. Therefore, White is not entitled to authorization to re-raise the claim. 28 U.S.C.

---

[2]    Notably, postconviction DNA testing showed "unequivocally" that White's DNA was found inside the victims' apartment, *White v. Thaler*, 2011 WL 4625361, at *5, and there was testimony at trial that evidence of another DNA donor was found at the scene, *id.* (citing 17 RR 388).

§ 2244(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed"). His motion for authorization should therefore be denied.

## B. None of White's claims are based on a previously undiscoverable factual predicate.

Each of White's three proposed claims relate to his punishment, not his capital murder conviction. Mot. 1–7. Consequently, he is necessarily disentitled to authorization under § 2244(b)(2)(B). *In re Johnson*, 935 F.3d at 291 n.1; *In re Webster*, 605 F.3d 256, 258–59 (5th Cir. 2010).

White suggests his *Atkins* claim could not have been raised previously because his family and friends were unwilling to discuss White's adaptive deficits until he had an execution date. Mot. 2–3. He argues such reluctance is encountered in every *Atkins* case, making application of AEDPA's successiveness limitation impossible. Mot. at 2–3. Such an argument seeks authorization under § 2244(b)(2)(B), but as noted above, an *Atkins* claim is categorically disentitled to authorization under that provision. *In re Webster*, 605 F.3d at 258–59. Moreover, White's argument is belied by the innumerable cases in which *Atkins* claims have been raised and supported by adaptive behavior evidence

before an execution date has been scheduled. It is also belied by the fact that White submitted in 2009 a report by his expert, Dr. Patricia Averill, that discussed White's purported adaptive deficits. App. D. The report was supported by an affidavit of White's sister, Monica Garrett, who stated White struggled in school and that she helped him with his homework. SHCR-04 at 11–17. Moreover, White's 2009 federal habeas petition was accompanied by affidavits of his family members that discussed, among other things, White's addiction to drugs. ROA.908–21. There is simply no reason to conclude *Atkins* claims by their nature cannot be raised until an execution date is set.

White also argues time limitations on when an *Atkins* claim may be raised cannot be applied, but he provides no support for that contention.[3] Indeed, this Court has held AEDPA's limitations provision applies to *Atkins* claims. *Henderson v. Thaler*, 626 F.3d 773, 781 (5th Cir. 2010) (declining to create an exception to AEDPA's statute of limitations based on actual innocence of the death penalty). And this Court has held in the successiveness context that an *Atkins* claim was time barred. *See, e.g., In*

---

[3]    It is true that intellectual disability is a status, but it is one that must have an "onset" when the individual was a minor. *Moore v. Texas*, 581 U.S. 1, 7 (2017).

*re Burton*, 111 F.4th 664, 666–67 (5th Cir. 2024). Again, White provides no legal or prudential support for the assertion that an *Atkins* claim cannot be barred under § 2244(b)(2)(B). Therefore, his motion for authorization should be denied.

### C.    None of White's claims satisfy § 2244(b)(2)(A).

None of White's claims satisfy the requirement of § 2244(b)(2)(A) that a successive claim be based on a new, retroactively applied rule of constitutional law. Therefore, his motion should be denied.

### 1.    White's claim of innocence of the death penalty and his "weighing" claim are not based on new retroactively applicable rules of constitutional law.

White's motion raises claims alleging he is innocent of the death penalty in light of DNA evidence and evidence of cocaine psychosis, and that he is entitled to reweighing of the aggravating and mitigating evidence. Mot. 4–7. Neither of the claims relies on a new, retroactively applied rule of constitutional law. *See* 28 U.S.C. § 2244(b)(2)(A).

White's claim that he is innocent of the death penalty, to the extent it states a claim for relief,[4] is based on *Sawyer v. Whitley*, 505 U.S. 333

---

[4]    *Rocha v. Thaler*, 626 F.3d 815, 818 (5th Cir. 2010) ("[A] claim of actual innocence of the death penalty under *Sawyer* is not itself a claim for relief[.]").

(1992), which predated his initial federal habeas proceedings. Therefore, the claim necessarily fails to satisfy § 2244(b)(2)(A).

White also cites to the Supreme Court's recent grant of a stay of execution in *Gutierrez v. Saenz*, 144 S. Ct. 2718 (2024),[5] a civil rights case involving a procedural due process challenge to Texas's postconviction DNA testing statute.[6] But the Supreme Court's stay in *Gutierrez* did not even dispose of the plaintiff's certiorari petition let alone set forth a new, retroactively applicable rule of constitutional law.[7] *See id.*; *see also Kelly v. Quarterman*, 296 F. App'x 381, 382 (5th Cir. 2008) ("[W]e are bound by our precedent even after the Supreme Court grants certiorari in another

---

[5]    The district court in *Gutierrez* held Texas's postconviction DNA testing statute, Chapter 64, was irreconcilable with Texas's abuse-of-the-writ statute, Article 11.071 of the Texas Code of Criminal Procedure. *Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 910–11 (S.D. Tex. 2021). The Fifth Circuit vacated the declaratory judgment. *Gutierrez v. Saenz*, 93 F.4th at 275.

[6]    This underscores a fundamental problem with White's reliance on *Gutierrez*. His argument does not raise a cognizable habeas claim but rather hints at a challenge to the constitutionality of Texas's postconviction relief statute, Texas Code of Criminal Procedure 11.073.

[7]    White filed a petition for a writ of certiorari following the CCA's dismissal of his subsequent state habeas application. White argued the limitation in Texas Code of Criminal Procedure Article 11.073 to claims involving new evidence of innocence of the crime but not punishment violated due process. Pet. Cert., *White v. Texas*, No. 14-8126 (Jan. 26, 2015). The Court denied the petition. *White v. Texas*, 583 U.S. 850 (2017).

case on the relevant issue."); *United States v. Lopez-Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008). Moreover, the issue in *Gutierrez* was purely whether the plaintiff had standing. *See Gutierrez v. Saenz*, 93 F.4th 267, 275 (5th Cir. 2024). White suggests the Supreme Court's stay indicates it believes the plaintiff will succeed on the merits of his claim, but this elides the limited issue that was before the Court. Moreover, the Supreme Court recently *vacated a stay* in a case involving a substantially similar claim as the plaintiff's claim in *Gutierrez. Murphy v. Nasser*, 84 F.4th 288, 290 (5th Cir. 2023) (declining to rule on defendant's motion to vacate stay of execution) ("Murphy challenges the limitation of testing to evidence affecting guilt."), 144 S. Ct. 324 (2023) (granting application to vacate district court's stay of execution). Therefore, White does not raise a cognizable claim that could satisfy § 2244(b)(2)(A).

Similarly, White's weighing claim does not satisfy § 2244(b)(2)(A). Most importantly, White does not actually raise a claim—i.e., a claim alleging trial counsel were ineffective at the punishment phase of trial— for relief with respect to the CCA's opinion in *Ex parte Andrus*, 622 S.W.3d 892 (Tex. Crim. App. 2021). Mot. 6. Instead, he alleges the CCA departed from its earlier precedent and has begun to weigh mitigating

evidence against aggravating evidence when assessing whether a habeas applicant was prejudiced by trial counsel's allegedly deficient performance punishment phase. Mot. 6. But White does not seek authorization to raise an ineffective-assistance-of-trial-counsel claim. Therefore, his reliance on *Andrus* is baseless. More importantly, the CCA's opinion in *Ex parte Andrus* is clearly not a Supreme Court opinion, let alone a retroactively applicable one, so it cannot form the basis of a request for authorization under § 2244(b)(2)(A). White's motion for authorization should be denied.

**2. White's *Atkins* claim is barred under § 2244(b)(2)(A) because it does not rely on a new retroactive rule of constitutional law that was previously unavailable.**

The Supreme Court announced its decision in *Atkins* on June 20, 2002. White's amended federal habeas petition was filed in December 2009, ROA.787–882, and it was denied in 2011, *White v. Thaler*, 2011 WL 4625361, at *15. Despite the availability of an *Atkins* claim during his initial federal habeas proceedings and when he filed his first motion for authorization in 2015, *In re White*, 602 F. App'x at 958, White did not raise an *Atkins* claim until he filed his fifth subsequent state habeas application on August 23, 2024.

White now argues that an Eighth Amendment claim alleging he is ineligible for execution because he is intellectually disabled—and necessarily has been since before the age of eighteen—could not have been raised at any time prior to the Supreme Court's decision in *Moore I*, in which the Court announced additional Eighth Amendment rules about how a State must define intellectual disability. Mot. 2. White seems to allege *Moore I* announced a new substantive rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable to him. White is incorrect because *Moore I* did not create a new claim—the claim he raises is an *Atkins* claim. And while the case did create a new rule of law, the rule was procedural not substantive, and the Supreme Court has never held that it should apply retroactively. Therefore, White cannot circumvent § 2244(b)(2)'s prohibition against a successive petition.

### a.    *Moore I* is not retroactively applied.

In *Tyler v. Cain,* the Supreme Court explained that the § 2244(b)(2)(A) requirement "is satisfied only if [the Supreme] Court has held that the new rule is retroactively applicable to cases on collateral review." 533 U.S. 656, 662 (2001). The Supreme Court did not find *Moore*

*I* retroactive, and no Supreme Court decision since has so held. To the contrary, in *Shoop v. Hill*, the Supreme Court criticized a federal circuit court for relying on *Moore I* to assess the reasonableness of a state court adjudication under § 2254(d) because it was not a clearly established rule of constitutional law at the time of the state court's adjudication. 586 U.S. 45, 50–52 (2019) (per curium).

White's arguments for retractive application of *Moore I* are unpersuasive. To the extent *Teague v. Lane,* 489 U.S. 288 (1989), even applies to the consideration of whether the district court has jurisdiction to consider his claim, *Moore I* is not a substantive rule, as alleged by White. The rule announced in *Moore I* "neither decriminalize[s] a class of conduct nor prohibits imposition of capital punishment on a particular class of persons." *Saffle v. Parks*, 494 U.S. 484, 495 (1990). *Atkins* itself was a substantive rule that barred death sentences for intellectually disabled persons as a class. *See* 536 U.S. at 321. But, as the Supreme Court noted in *Shoop, Atkins* identified the standard definitions of intellectual disability but "did not definitively resolve" how those elements should be evaluated, leaving "application in the first instance to the States." 586 U.S. at 50 (citing *Atkins,* 536 U.S. at 317–18). The

Supreme Court reversed the Sixth Circuit's attempt to retroactively apply the *Moore I* holding as "merely an application of what was clearly established in *Atkins,*" finding that the Sixth Circuit failed to "explain how the rule it applied can be teased out of the *Atkins* Court's brief comments about the meaning of" intellectual disability. *Id.* at 50 (citing *Hill v. Anderson,* 881 F.3d 483, 487 (6th Circuit 2018)); *cf. Weathers v. Davis*, 915 F.3d 1025, 1027–28 (5th Cir. 2019) ("As with *Moore*, it cannot be contended that *Hall*, which overturned a formulaic IQ standard that had been used by the state of Florida but never in Texas, simply enunciated 'clearly established Federal law' made retroactive as required by AEDPA.").

While *Moore I* rejected some of the methods adopted by the CCA for examining *Atkins* claims, the Court did not create a substantive rule of law regarding the definition of intellectual disability. *See Shoop,* 586 U.S. at 49 (in *Hall* and *Moore I,* Supreme Court "expounded on the definition of intellectual disability" as established in *Atkins*). *Moore I* addressed the *procedures* by which *Atkins* determinations are made and is, thus, a rule of procedure not substance. And, after *Edwards v. Vannoy,* it is clear procedural rules will never apply retroactively. 593 U.S. 255, 272 (2021)

("It is time—probably long past time—to make explicit what has become increasingly apparent to bench and bar over the last 32 years: New procedural rules do not apply retroactively on federal collateral review.").

Any suggestion that the Supreme Court made *Moore I* retroactive by extending it to Bobby Moore, himself, does not satisfy the requirement that, to obtain relief in a successive petition the rule upon which the petition relied "must have been 'made retroactive to cases on collateral review by the Supreme Court.'" *Tyler*, 533 U.S. at 662. The Supreme Court makes this prerequisite clear: "Based on the plain meaning of the text read as a whole, we conclude that 'made' means 'held' and, thus, the requirement is satisfied only if this Court has held that the new rule is retroactively applicable to cases on collateral review." *Id*. "Quite significantly, under this provision, the Supreme Court is the *only* entity that can 'ma[k]e' a new rule retroactive. The new rule becomes retroactive, not by the decisions of the lower court or by the combined action of the Supreme Court and the lower courts, but simply by the action of the Supreme Court." *Id*. at 663 (emphasis added). Thus, "a new

rule is not 'made retroactive to cases on collateral review' unless the Supreme Court *holds* it to be retroactive." *Id*. (emphasis added).

The Supreme Court has not so held. *See In re Payne*, 722 F. App'x 534, 538 (6th Cir. 2018) (rejecting argument that Supreme Court made *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore I* retroactive through multiple holdings, and that decisions themselves are examples of retroactive application; both decisions merely analyzed application of *Atkins* claims that were appropriately raised in state post-conviction proceedings.). Indeed, this Court recognized that *Shoop* "contradicts" the contention that *Moore I*'s rejection of Texas's "previous framework for determining intellectual disability in this context . . . thus facilitated a successive *Atkins* claim." *In re Sparks*, 939 F.3d 630, 632 (5th Cir. 2019) (denying authorization on a new *Atkins* claim relying on *Moore I*); *see In re Burton*, 111 F.4th at 666 n.3; *see also Weathers*, 915 F.3d at 1027 (citing *Shoop,* "We adhere to this court's previous decision because the Supreme Court has just affirmed that lower courts may not properly apply *Moore I* retroactively in habeas corpus to state court decisions that preceded it."). And nearly every circuit to consider the issue has held that,

while *Moore I* may be a new rule, the Supreme Court has not made it retroactive.[8]

White fails to demonstrate that, prior to *Moore I,* an Eighth Amendment *Atkins* claim was previously unavailable to him at the time he filed his first federal habeas petition. Regardless, because the Supreme Court has never held *Moore I* is retroactive, White cannot satisfy § 2244(b)(2)(A), and his motion should be denied.

### b.    *Atkins* was not previously unavailable.

To the extent White argues his *Atkins* claim was previously unavailable to him until the DSM-5 was published, his argument fails.

---

[8]    *See In re Richardson*, 802 F. App'x 750, 755–56 (4th Cir. 2020) (unpublished) ("*Hall* and *Moore* do not address retroactivity, and no subsequent Supreme Court case has held that *Hall* or *Moore* apply retroactively to cases on collateral review."); *In re Payne*, 722 F. App'x at 538 (denying authorization and finding that "[e]ven if we assume, without deciding, that *Hall* and *Moore* announce new rules of constitutional law, Payne has not shown that these decisions apply retroactively. . . . More importantly, Payne fails to show that *the Supreme Court* has determined that *Moore* and *Hall* apply retroactively." (emphasis added)); *Fulks v. Watson*, 4 F.4th 586, 592 (7th Cir. 2021) ("Nor do *Hall, Moore I,* or *Moore II* create 'new rule[s] of constitutional law, made retroactive to cases on collateral review by the Supreme Court'"); *Williams v. Kelley*, 858 F.3d 464, 474 (8th Cir. 2017) (disagreeing "that *Moore* announced a new rule of constitutional procedure" and noting that Chief Justice Roberts's observation "that the Court had crafted 'a constitutional holding' may presage an eventual ruling that *Moore* will be given [retroactive] effect, but that is a matter for the Court to decide in due course and not by us in the posture in which this case has been presented to us"); *Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1340 (11th Cir. 2019) (agreeing with district court that *Moore I* is not retroactive).

In *In re Johnson*, 935 F.3d at 293, and *In re Cathey*, 857 F.3d 221, 232–34 (5th Cir. 2017), the petitioners filed their initial federal petitions after *Atkins* but did not raise *Atkins* claims, despite some evidence supporting such claims. *In re Johnson*, 935 F.3d at 287, 292; *In re Cathey*, 857 F.3d at 227. When they later sought authorization to raise their *Atkins* claims in successive petitions, they asserted the claims were "previously unavailable" because, under the earlier understandings of the diagnostic criteria for intellectual disability, their claims would have been futile—specifically, their IQ scores were too high for a finding of intellectual disability under prior criteria. *In re Johnson*, 935 F.3d at 292–93 (six years after conviction, new DSM-5 recognized IQ score over 70 may still qualify as intellectually disabled); *In re Cathey*, 857 F.3d at 229–33, 237–38 (Cathey's pre-trial 77 IQ score too high for intellectual disability, but discovery of purported 73 IQ score twelve years after conviction, court recognition of Flynn Effect nine years after conviction, and Supreme Court's 2014 rejection of 70 IQ score as ceiling for intellectual disability, rendered *Atkins* claim newly available). Moreover, Johnson presented a newly obtained IQ score of 70 in support of his request for authorization. *In re Johnson*, 935 F.3d at 292. Based on the change in diagnostic

criteria—and subsequent change in the legal framework for reviewing *Atkins* claims—this Court found the petitioners' claims were "previously unavailable" and, thus, satisfied subsection § 2244 (b)(2)(A). *In re Johnson*, 935 F.3d at 292; *see also In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019) (discussing *In re Johnson* and *In re Cathey*).

However, the *Johnson* Court specifically acknowledged that the finding of a later claim of possible merit in *Cathey* "was more than just a reassessment by medical professionals of this inmate's particular mental abilities. The significant change was in the medical methodology for evaluating the relevant disabilities and in courts' recognition of those changes." *In re Johnson,* 935 F.3d at 292–93. This stands in stark contrast to White's proposed *Atkins* claim, which rests entirely on a recent reassessment of his mental abilities—primarily based on application of the Flynn Effect—and not on recently updated guidelines under the DSM-5 or *Moore I*. App. C (affidavit of Dr. Greg Hupp). And unlike in *Johnson* and *Cathey*, White never possessed evidence that would have transformed a claim post-*Moore* or post-DSM-5 into a meritorious one. As discussed below, his previous full-scale IQ of 78 from 2008 precludes relief on an *Atkins* claim, even considering the Flynn

Effect, and he fails to provide adequate evidence of adaptive deficits.[9] His belated reliance on the Flynn Effect does not satisfy § 2244(b)(2)(A). *See In re Cathey*, 857 F.3d at 231.[10] White's *Atkins* claim fails to satisfy § 2244(b)(2)(A), and this Court should deny his motion for authorization.

### 3. White's claim fails on the merits.

To obtain authorization to raise a successive *Atkins* claim, White must also make a prima facie showing that he is intellectually disabled. *See In re Campbell,* 750 F.3d at 530. White has presented an *Atkins* claim in state court, which the CCA has rejected. Order, *Ex parte White*, No. WR-48-152-09 (Tex. Crim. App. Sept. 18, 2024). That adjudication was on the merits. *Busby v. Davis,* 925 F.3d 699, 709 (5th Cir. 2019) (citing *Ex parte Blue,* 230 S.W.3d 151, 163 (Tex. Crim. App. 2007)). Therefore,

---

[9]    Notably, under *In re Cathey*, the Flynn Effect could not render White's *Atkins* claim previously unavailable, as White's initial federal habeas petition was denied in 2011, well after the Flynn Effect had been discussed in court opinions. *In re Cathey*, 857 F.3d at 231.

[10]    *Cf. In re Halprin,* 788 F. App'x 941, 943–44 (5th Cir. Sept. 23, 2019) (Rejecting attempt to argue previous legal unavailability under § 2244(b)(2)(A) of a claim pursuant to *Tumey v. Ohio,* 273 U.S. 510 (1927), because the claim was factually unavailable to him until almost a century later, finding "*Tumey* is not a 'new rule' within the meaning of § 2244(b)(2)(A)," and refusing to conflate the "previously unavailable" requirement of subsection (b)(2)(A) with the new "factual predicate" standard found in subsection (b)(2)(B)(i)).

the CCA's *Atkins* ruling is ultimately subject to AEDPA's relitigation bar. *Id.* at 710–11.

To demonstrate he is intellectually disabled and thus ineligible for execution, White must show: (1) he has deficits in intellectual functioning; (2) he has deficits in adaptive functioning; and (3) the onset of these deficits occurred during childhood or adolescence. *Moore I*, 581 U.S. at 7; *Petetan v. State*, 622 S.W.3d 321, 333 (Tex. Crim. App. 2021). In support of his claim in state court, White pointed to IQ scores of 76 and 78, which were obtained prior to his 1996 trial and in support of his 2009 subsequent habeas application, respectively. Sixth Sub. Appl. for Writ of Habeas Corpus Pursuant to Tex. Code of Crim. Proc. Art. 11.071, *Ex parte White*, No. 07238470101 (180th Dist. Ct. Harris Co., Tex.), App. C (Hupp Affidavit); 21 RR 315–16; SCHR-04 at 11–16. He also presented a report by Dr. Hupp who stated application of the Flynn Effect to White's score of 78 would adjust the score downward at least to 75, and the score could be, accounting for the lower end of the standard error of measurement, possibly as low as 68. Hupp Affidavit at 5. Dr. Hupp also concluded White exhibited adaptive deficits during the developmental period. *Id.*

White's evidence does not present a prima facie claim for intellectual disability. Under the DSM-5-TR, individuals with intellectual disability have scores approximately two standard deviations or more below the population mean, including a margin for measurement error, or a score of 65–75. DSM-5-TR at 42; *see In re Cathey*, 857 F.3d at 236. According to Dr. Averill, applying the standard error of measurement to White's unadjusted IQ score of 78 that she obtained produced a range of 74–83. App. D at 4. According to Dr. Hupp, the range would be 71–85 if applying a seven-point error of measurement.[11] App. C at 5. Based on the Supreme Court's decision in *Moore I*, even the low end of the range of error does not fall within the range of intellectual disability sufficient to trigger an analysis of adaptive deficits. *See Moore I*, 581 U.S. at 14 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning.").

This Court has held the CCA reasonably determined that a petitioner could not demonstrate subaverage intellectual functioning

---

[11]    It is at least questionable why Dr. Hupp suggests such a larger range of error should apply than Dr. Averill—who conducted the assessment that produced the score of 78—reported in 2008.

when the lowest IQ score he provided was a 74 on the WAIS-IV (yielding a range from 70–79), which the test's administrator described as "Borderline." *Busby*, 925 F.3d at 716–20. This Court reached a similar conclusion in another opinion that postdated *Moore I*, where the petitioner's score, considered with the range of error, did not fall at or below 70. *Green v. Lumpkin*, 860 F. App'x 930, 940 (5th Cir. 2021) (per curiam) (holding that where lowest IQ score submitted was 78, the state court was not unreasonable under *Moore I* for determining the petitioner was not intellectually disabled because petitioner could not satisfy the first *Atkins* prong). This Court stated that reason alone was enough to foreclose relief on the *Atkins* claim. *Id.* The same is true here.

As for the Flynn Effect, adjustment of IQ scores is not required. The Flynn Effect posits that over time, IQ scores of a population rise without corresponding increases in intelligence and, thus, the test must be re-normed. *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The Flynn Effect "may affect" a test score. DSM-5-TR at 38; *see Ex parte Cathey*, 451 S.W.3d 12–14 (Tex. Crim. App. 2015). Importantly, though, the DSM-5-TR does not require adjusting a score downward for the Flynn Effect. DSM-5-TR at 38. Additionally, Texas law holds that an IQ score "may not

be changed" to adjust for the Flynn Effect. *Cathey*, 451 S.W.3d at 18.[12] Further, this Court "has not recognized the Flynn effect," *Brumfield v. Cain*, 808 F.3d 1041, 1060 n. 27 (5th Cir. 2015),[13] and the Supreme Court has called it a "controversial theory." *Dunn v. Reeves*, 594 U.S. 731, 736–37 (2021) (per curiam). Without this adjustment, White cannot make a prima facie showing on the first criteria for intellectual disability, making it unnecessary to assess his adaptive behavior. *See Moore I*, 581 U.S. at 15 ("[W]e require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.").

---

[12]    The CCA has noted that practice effects and the Flynn Effect "may affect test scores," *Petetan*, 622 S.W.3d at 338 (citing DSM-5 at 37), and courts "may consider the Flynn Effect and its possible impact on IQ scores generally" only "[w]hen it is impossible to retest using the most current IQ test available." *Ex parte Cathey*, 451 S.W.3d at 5, 18. And even then, courts "may consider that effect only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of concentration, and so forth." *Id*. at 5.

[13]    Unlike *In re Cathey*, White does not have other evidence—in *Cathey,* it was purported evidence that Cathey's IQ was below 73—to support an inference raised by the Flynn Effect that his score of 78 was artificially inflated. 857 F.3d at 236–37. Importantly, neither *In re Cathey* nor *In re Johnson* contradict *Brumfield* because they do not resolve the issue regarding application of the Flynn Effect. Moreover, unlike *In re Johnson*, White has not produced a new full scale IQ score within the *Atkins* range of 70 or below. *In re Johnson*, 935 F.3d at 292.

Moreover, as White's expert Dr. Hupp has acknowledged, App. C at 4, "White has never been administer[ed] nor evaluated on a standardized measure of adaptive functioning." The DSM-5-TR requires "[t]he diagnosis of intellectual developmental disorder is based on both clinical assessment and standardized testing of intellectual functions, standardized neuropsychological tests, and standardized tests of adaptive functioning."[14] DSM-5-TR at 38. White's *Atkins* claim is, therefore, facially inadequate to justify authorization.

White fails to present evidence of either significantly subaverage intellectual or adaptive deficits. White cannot make out a prima facie *Atkins* claim without such evidence. Therefore, his motion for authorization should be denied.

## II.   The Statute of Limitations Precludes Authorization.

As noted above, White suggests AEDPA's time limitations do not apply to *Atkins* claims, but that is not accurate. *See In re Burton*, 111

---

[14]    Even then, reliance on affidavits of White's friends and family regarding decades-old recollections of White's behavior when he was a minor would be problematic even in the context of an "objective" measurement of White's adaptive behavior. *See Ex parte Cathey*, 451 S.W.3d at 20 (recognizing that a measurement of adaptive behavior was not designed to be administered retrospectively and was susceptible to reporters being "highly motivated to misremember").

F.4th at 666. Indeed, this Court can deny authorization based on timeliness. *In re Campbell*, 750 F.3d at 532 n.9; *see also In re Jones,* 998 F.3d 187, 189 (5th Cir. 2021). The Court should exercise this authority and conclude that any successive petition based upon White's proposed claims is untimely.

Section 2244(d)(1) applies a one-year limitations period to any application for writ of habeas corpus. In this case, the limitations period begins running from the latest of either:

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1); *In re Jones,* 998 F.3d at 189.

First, White's claim that he is innocent of the death penalty in light of DNA evidence and evidence of cocaine psychosis is significantly untimely. Again, he raised that claim in his initial federal habeas proceedings, and it was denied in 2011. *White v. Thaler*, 2011 WL 4625361, at *4–5. Therefore, the claim is untimely by more than a decade.

Second, White's claim related to the vacated declaratory judgment in *Gutierrez* is untimely because it is not based on any relevant Supreme Court precedent. To the extent the claim relies on the district court's declaratory judgment as a factual predicate, it is untimely because that judgment was entered in 2021. *Gutierrez v. Saenz*, 565 F. Supp. 3d at 910. Moreover, White's subsequent state habeas application under Article 11.073 was dismissed in 2016, and the Supreme Court denied certiorari in that case in 2017, *White v. Texas*, 583 U.S. 850.

Third, White's weighing claim, like his *Gutierrez* claim, is not based on any new Supreme Court precedent. Instead, it is based on the CCA's opinion in *Ex parte Andrus*, 622 S.W.3d at 902.[15] And as discussed above, White does not proffer any underlying ineffective-assistance-of-trial-counsel claim that he wishes to raise in a successive petition.

Fourth, White's *Atkins* claim is untimely. As discussed above, this Court has previously discounted the contention that *Moore I* "facilitated

---

[15]    White asserts the CCA's opinion in *Ex parte Andrus* created a new mode of analyzing prejudice, but that is not accurate. The CCA has, consistent with *Strickland v. Washington*, 466 U.S. 668 (1984), long considered whether newly proffered mitigating evidence would have changed the result of an applicant's trial in light of the mitigating and aggravating evidence that was admitted at trial. *See, e.g. Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006); *Ex parte Gonzales*, 204 S.W.3d 391, 399 (Tex. Crim. App. 2006).

a successive *Atkins* claim" finding it "contradicts" *Shoop*. *In re Sparks,* 939 F.3d at 632. But regardless, this Court held "the statutory time limit for asserting this claim is one year following *Moore"* and a delay in filing beyond the one-year statute of limitations recognized in § 2244(d)(1) is untimely. *Id.* at 632 (three-year delay post-*Moore* untimely); *see In re Burton*, 111 F.4th at 666; *see also In re Jones,* 998 F.3d at 189–90 (even considering *Moore II*,[16] decided in 2019, petition filed in 2021 was untimely). Because the instant motion was not filed until 2024—seven years after *Moore I,* and five years after *Moore II*—White's petition is clearly too late and, pursuant to this Court's precedent, should be denied.

Even if White argued his claim was timely under § 2244(d)(1)(D) because he could not have obtained the supporting affidavits from his family until an execution date, the argument would fail. *See Lookingbill v. Cockrell,* 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an   argument adequately,   we   consider   it waived."). Again, his expert inquired into White's adaptive deficits in 2009, App. D, and White submitted affidavits of family members in support of his habeas claims at that time, ROA.908–921. He simply

---

[16]    *Moore v. Texas,* 586 U.S. 133 (2019) (*Moore II*).

cannot show it was not possible to raise an *Atkins* claim until an execution date was set. Indeed, he had an execution date scheduled in 2015, but he waited until 2024 to submit the supportive affidavits. There is no basis on which to find White's motion timely, nor does White argue equitable tolling should apply to render his motion timely. Therefore, this Court should deny the motion.

## III. This Court Should Deny White's Request for a Stay of Execution.

This Court should deny White's request for a stay of execution. A stay of execution "is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough,* 547 U.S. 573, 584 (2006) (citing *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)). Rather, the inmate must satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits. *Id*. (citing *Barefoot v. Estelle*, 463 U.S. 880, 895–96 (1983)). When the requested relief is a stay of execution, a court must consider:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). A federal court must consider "the State's strong interest in proceeding with its judgment" and "attempt[s] at manipulation." *Nelson*, 541 U.S. at 649–50 (citing *Gomez v. U.S. Dist. Court for Northern Dist of California,* 503 U.S. 653, 654 (1992)).

As demonstrated above, White fails to demonstrate a likelihood of success on either the motion for authorization or the underlying claims. First, White cannot demonstrate that he meets the statutory prerequisites for granting a motion for authorization. His *Atkins* claim does not rely upon a "new" rule of constitutional law, made retroactive to him by the Supreme Court. 28 U.S.C. § 2244(b)(2)(A). Indeed, *Atkins* was decided over twenty-two years ago, while *Moore I* was decided seven years ago. His evidence falls far short of demonstrating he meets the requirements of a claim for intellectual disability. His score of 78, places him outside the range of intellectual disability, and he provides no objective measurement of his adaptive behavior. White's other claims do not rely on Supreme Court precedent or a newly discoverable factual

43

predicate. All of White's claims are impermissibly successive and time barred. In short, White cannot demonstrate the likelihood of success on either the motion for authorization or on the merits of his claim on appeal.

Further, "[b]oth the State and the victims of crimes have an important interest in the timely enforcement of a sentence." *Hill*, 547 U.S. at 584. White killed the Edwards sisters and their mother in 1989 and was convicted and sentenced to death in 1996. He exhaustively appealed his sentence through both state and federal court, obtaining a stay of execution in 2015. His case sat dormant until an execution date was set almost ten years later. White's last-minute attempt to raise new, meritless claims that could and should have been raised long ago is plainly an effort to delay his sentence. Such dilatory tactics underscore why the court should deny this motion for stay. *See, e.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 149–51 (2019). White presents no reason to delay his execution date any longer. The Edwards family—and the victims of White's other murders, Greta Williams and Hai Pham—deserve justice for his decades-old crimes.

For the reasons argued above, this Court should deny the requested relief and a stay. White cannot overcome the strong presumption against granting a stay or demonstrate that the balance of equities entitles him to a stay of execution. For the same reason, White fails to show that he would suffer irreparable harm if denied a stay of execution. *Walker v. Epps*, 287 F. App'x 371, 375 (5th Cir. 2008) (explaining that "the merits of [the movant's] case are essential to [the court's] determination of whether he will suffer irreparable harm if a stay does not issue"). White cannot show he would be irreparably harmed if denied additional process to which he has no entitlement. White's request for a stay of execution should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny White's motion for authorization to file a successive federal petition.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

<u>s/ Jefferson Clendenin</u>
JEFFERSON CLENDENIN
Assistant Attorney General
Texas Bar No. 24059589
    *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: jay.clendenin@oag.texas.gov

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2024, I electronically filed the foregoing document with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to counsel of record who has consented in writing to accept this Notice as service of this document by electronic means.

s/ Jefferson Clendenin
JEFFERSON CLENDENIN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this Brief in Response complies with Federal Rule of Appellate Procedure 32(a) in that it contains 11,253 words. Microsoft Word, Century Schoolbook Font, 14 points.

<u>s/ Jefferson Clendenin</u>
JEFFERSON CLENDENIN
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

<u>s/ Jefferson Clendenin</u>
JEFFERSON CLENDENIN
Assistant Attorney General